517 F.2d 826
 11 Fair Empl.Prac.Cas. 167,
10 Empl. Prac. Dec. P 10,368
UNITED STATES of America et al., Plaintiffs-Appellees,
v.
ALLEGHENY-LUDLUM INDUSTRIES, INC., et al., Defendants-Appellees,
Sidney S. Harris et al., Intervenors-Appellants,
National Organization For Women, Inc., et al., Movants-Appellants.
 No. 74-3056.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 18, 1975.
 
 Oscar W. Adams, Jr., Birmingham, Ala., Kenneth L. Johnson, Baltimore, Md., Bernard D. Marcus, Pittsburgh, Pa., Arthur J. Mandell, Gabrielle K. McDonald, Mark T. McDonald, Houston, Tex., J. Richmond Pearson, Birmingham, Ala., Nathaniel R. Jones, NAACP, New York City, for S. S. Harris and others.
 
 
 1
 Judith A. Lonnquist, Chicago, Ill., Kenneth L. Johnson, Emily M. Rody, Baltimore, Md., Jack Greenberg, James M. Nabrit, III, Barry L. Goldstein, New York City, for National Organization for Women and others.
 
 
 2
 William J. Kilberg, Sol. of Labor, U. S. Dept. of Labor, Washington, D. C., Wayman G. Sherrer, U. S. Atty., Birmingham, Ala., Leonard L. Scheinholtz, Pittsburg, Pa., Robert T. Moore, U. S. Dept. of Justice, Washington, D. C., Francis St. C. O'Leary, Pittsburgh, Pa., William A. Carey, Gen. Counsel, William L. Robinson, Joseph T. Eddins, EEOC, Washington, D. C., for U.S.A. and Wheeling-Pittsburgh Steel Corp.
 
 
 3
 William K. Murray, James R. Forman, Jr., Birmingham, Ala., for U. S. Steel Corp., Allegheny-Ludlum Industries, Republic Steel, Youngstown Corp., Bethlehem Steel, Wheeling-Pittsburgh Steel, Armco Steel, National Steel, Jones-Laughlin.
 
 
 4
 Michael H. Gottesman, Washington, D. C., Jerome Cooper, Birmingham, Ala., for Steelworkers.
 
 
 5
 Carl B. Frankel, Asst. Gen. Counsel, United Steelworkers of America, Pittsburgh, Pa., Marshall Harris, Asso. Sol. Labor Relations, Civ. Rights, Dept. of Labor, Washington, D. C., Vincent L. Matera, Pittsburgh, Pa., for U. S. Steel Corp.
 
 
 6
 Ralph L. McAfee, New York City, for Bethlehem Steel.
 
 
 7
 David Scribner, New York City, James H. Logan, Pittsburgh, Pa., Elizabeth M. Schnieder, Doris Peterson, Center for Constitutional Rights, New York City, for amici curiae.
 
 
 8
 Appeals from the United States District Court for the Northern District of Alabama.
 
 
 9
 Before THORNBERRY, MORGAN and CLARK, Circuit Judges.
 
 THORNBERRY, Circuit Judge:
 
 10
 These appeals present novel and important issues which require us to consider the scope of the federal government's authority to encourage and negotiate expeditious and efficient settlement of widespead charges of employment discrimination in the nation's steel industry. Some of these issues are procedural in nature; others call into question the substantive legality of the means utilized. Some issues are ripe for decision; others are essentially hypothetical and conjectural. During the interim between the oral argument of these appeals in December, 1974 and the present, we have carefully examined the attacks which have been advanced against the settlement. Our conclusion is that the settlement has not been shown to be in any respect unlawful or improper, and hence its terms, conditions, and benefits must go forward immediately in their entirety.
 
 I. INTRODUCTION AND BACKGROUND
 
 11
 On April 12, 1974, a complaint was filed in the federal district court for the Northern District of Alabama. The plaintiffs were the United States, on behalf of the Secretary of Labor, and the Equal Employment Opportunity Commission. Nine major steel companies[1] and the United Steelworkers of America were named as defendants. The suit involved some 240-250 plants at which more than 300,000 persons are employed, over one-fifth of whom are black, Latin American, or female. Alleging massive patterns and practices of hiring and job assignment discrimination on the bases of race, sex, and national origin, the complaint sought to enforce the edicts of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and contractual obligations under Executive Order 11246, as amended, 3 C.F.R. 169 et seq. (1974).
 
 
 12
 The complaint charged that the companies had violated Title VII and Executive Order 11246 by hiring and assigning employees on impermissible grounds, and by restricting ethnic minorities and females to low-paying and undesirable jobs with scant opportunities for advancement. The complaint also charged the companies and the union with formulating collective bargaining contracts which established seniority systems for promotion, layoff, recall, and transfer so as to deprive minority and female employees of opportunities for advancement comparable to those enjoyed by white males.
 
 
 13
 The filing of the complaint culminated more than six months of intensive, hard-fought negotiations between, on one side, the EEOC and Departments of Justice and Labor, and on the other the companies and the union. Simultaneously with the filing of the complaint, the parties announced to the court that a tentative nationwide settlement had been reached. The parties multilaterally reduced their agreement to the form of two extensive written consent decrees. Describing the decrees as "a thoughtful and earnest attempt to respond to and to reconcile competition between charges of employment discrimination made on behalf of black, female, and Spanish surnamed workers and applicants,"[2] District Judge Pointer signed and entered the documents later that same day.[3]
 
 
 14
 Consent Decree I is aimed at the practices of the union as well as those of the steel companies. It permanently enjoins the defendants from "discriminating in any aspect of employment on the basis of race, color, sex or national origin and from failing or refusing to fully implement" the substantive relief set forth therein. The items covered by Consent Decree I are mainly matters historically encompassed by collective bargaining. The substantive relief falls into three basic categories: (1) immediate implementation of broad plantwide seniority, along with transfer and testing reforms, and adoption of ongoing mechanisms for further reforms of seniority, departmental, and line of progression (LOP) structures, all of which are designed to correct the continuing effects of past discriminatory assignments; (2) establishment of goals and timetables for fuller utilization of females and minorities in occupations and job categories from which they were discriminatorily excluded in the past; and (3) a back pay fund of $30,940,000, to be paid to minority and female employees injured by the unlawful practices alleged in the complaint.[4]
 
 
 15
 Consent Decree II and its accompanying Agreement deal with aspects of employment which are mainly company-controlled and thus not subject to collective bargaining. The companies again are broadly enjoined from any form of unlawful employment discrimination. Also, Consent Decree II requires the companies to initiate affirmative action programs in hiring, initial assignments, promotions, management training, and recruitment of minorities and females.
 
 
 16
 The decrees must be made to function in varying and peculiar situations in accordance with the parties' ambitious objectives. Furthermore, the parties contemplated that unforeseen interpretive issues will inevitably arise and require resolution. With these considerations in mind, the decrees provide for the establishment of implementation and enforcement procedures through a system of Implementation Committees. These committees are established at each major plant to which the decrees are made applicable. Each committee includes at least two union representatives, one of whom is a member of the largest minority group in the plant,[5] and an equal number of company members. The government is entitled to designate a representative to meet with any Implementation Committee. The Implementation Committees are charged with assuring compliance with Consent Decree I, including changes in local seniority rules and LOPs, as well as the establishment of goals and timetables for affirmative action under paragraph 10. In addition, it is the Implementation Committees' responsibility to furnish employees with information about their rights under the settlement.
 
 
 17
 The Audit and Review Committee, established under paragraph 13 of Consent Decree I, is the hub mechanism in the decrees' system of continuing review, enforcement, and compliance. It is composed on an industry-wide basis of five management members, five union members, and one government member. It meets regularly to oversee compliance with the decrees and to resolve disputes which come before it, including any questions that the Implementation Committees have been unable to resolve. Matters which the Audit and Review Committee cannot resolve unanimously may be brought before the district court. Furthermore, all parties to the decrees have stipulated on the record that paragraph 20 of Consent Decree I, which vests the district court with continuing jurisdiction for at least five years, permits the court to review fully and, if necessary, correct any action taken pursuant to the decrees, irrespective of whether a party requests such review. Beginning no later than December 31, 1975, the Audit and Review Committee will review the entire experience under Consent Decree I. The committee may then propose remedial steps at any plant in order to overcome deficiencies in either the decree or its results. If the government representative remains dissatisfied with a committee proposal, he may take the matter to the district court. Finally, the Audit and Review Committee is responsibile at least annually for reviews of the various Implementation Committees' performance in establishing and fulfilling affirmative action goals in job assignment, hiring, promotion and seniority, and minority-female recruitment.
 
 
 18
 As the district court correctly determined, neither decree purports "to bind any individual employee or to prevent the institution or maintenance of private litigation."[6] At the time of the decrees' entry, hundreds of employment discrimination charges were pending against the defendants before the EEOC and federal district courts scattered throughout the country. Between twenty and sixty thousand minority and female individuals then stood beneath the overlapping umbrellas of these charges as members of putative aggrieved classes in actions seeking systemic injunctive relief and back pay. Thousands still do, and the problems of administrative and judicial management are truly awesome.[7] The consent decrees establish a formula for expeditious and coordinated resolution of the multitude of pending charges. With respect to pending cases in which district courts have already entered remedial decrees, the government, companies, and union have agreed to petition those courts for amendments to conform their relief to that contained in the consent decrees. The same action is being taken with respect to orders of the Secretary of Labor, rendered pursuant to Executive Order 11246, which were issued prior to entry of the decrees. In regard to other pending litigation, the parties to the consent decrees have agreed that release forms and notices to employees pursuant to subparagraphs 18(g) and (h) of Consent Decree I shall be forwarded to the courts trying the private actions, as well as to Judge Pointer for approval prior to distribution to all other affected employees. The parties have agreed on the record that they will observe any order or instruction issued by any of these courts. Audit and Review Committee Directive No. 1, P 5, May 31, 1974.
 
 
 19
 Under introductory paragraph C of each decree, the government has stipulated that in future cases involving private claims for relief, other than back pay, which would be inconsistent with the systemic relief provided by the decrees, the government will suggest to the forum court that the relief sought is unwarranted in the separate proceeding. The government, however, may proceed through the Audit and Review Committee mechanism to recommend that matters raised in the separate proceeding be submitted to Judge Pointer for resolution within the framework of the consent decrees. The government concedes, of course, and no one seriously argues contrariwise, that no forum court will be legally obliged to follow any government recommendation of dismissal, stay, or transfer as to any separate suit filed in such court.
 
 
 20
 With respect to charges pending at the administrative level at the time of the decrees' entry, the EEOC has agreed in paragraph 19 to expedite its processing schedule. The Commission will first identify those charges that allege violations for which the appropriate remedies are wholly within the scope of the decrees. In those cases, the EEOC will consider the charges settled and so notify the charging party. In addition, it will recommend to the charging party that he or she accept the back pay provided under paragraph 18(c) of Consent Decree I. As discussed, infra, the charging party is free to reject the EEOC's recommendation and commence a private suit for greater back pay or any other relief. As for pending charges that relate to matters which are not wholly within the scope of the decrees, the Commission will conduct the usual investigations and attempt to conciliate the charges. In all such cases, the time in which a charging party must decide whether to claim the back pay under paragraph 18 will be suspended during the administrative proceedings.
 
 
 21
 The overriding goal of the United States, the Secretary of Labor, the EEOC, the companies, and the union is comprehensive, final and fair settlement of charges of unlawful employment discrimination arising from patterns and practices alleged upon the part of the companies and the union up to and including the entry date of the consent decrees. Accordingly, introductory paragraph C of each decree provides for binding resolution, between and among the parties to the decrees, of all issues treated by the decrees, together with all issues which may arise as future effects of the resolved pre-decree discriminations. To the extent the defendants maintain compliance with the decrees as to issues covered and which through the various procedures may become covered thereby, the government has agreed that it shall deem the defendants to have complied with Title VII and Executive Order 11246.[8] As to matters which originate in discriminations occurring prior to and including the entry date, and which are covered by the complaint or the decrees, the settlement is res judicata between and among its signatories.
 
 
 22
 Two important factors, however, warrant clarification at this point. First, no private individual, as such, is a party to the consent decrees. Thus, the consent decrees do not seek by their terms to bind private individuals by way of res judicata or estoppel by judgment. It is only through the acceptance of the back pay and legally effective execution of the release contemplated by paragraph 18(g) of Consent Decree I that a private individual can compromise, by virtue of the decrees, any right that he may have. Apart from the $30,940,000 back pay fund, paragraphs 17 and 18 establish mandatory procedures for fully informing private parties of their rights. Paragraph 18 sets up specific guidelines and standards for computing and delivering back pay awards to electing employees. The Implementation Committees, the Audit and Review Committee, and ultimately the district court bear the critical responsibility to insure that individual employees have the opportunity to make free, intelligent decisions whether to accept the back pay under the consent decrees.
 
 
 23
 The second factor relates to the nature of the consent decrees' finality as contemplated by paragraph C. In that paragraph, the plaintiffs United States, the Secretary of Labor, and the EEOC have stated in so many words that they consider the decrees remedially adequate to bring the defendants into present compliance with federal anti-discrimination law and to compensate individual employees for the past and continuing effects of the alleged discriminatory practices which the decrees enjoin. Because the plaintiffs believe that the decrees are sufficient to those purposes, they have stipulated that the decrees are res judicata with respect to all legal, factual, and remedial issues within the scope of the complaint and the decrees. In other words, the plaintiffs and we take the parties at their word at oral argument have merely consented to proceed within the mechanics of the decrees in lieu of filing additional lawsuits and seeking additional judgments against the defendants with respect to matters covered by the decrees.
 
 
 24
 Also because they believe that the decrees provide adequate relief, the plaintiffs have agreed that compliance with the decrees shall be deemed compliance with Title VII and Executive Order 11246. Nonetheless, it is our understanding of the submissions to this court on behalf of all parties to the decrees that the government remains entirely free, from and after the date of entry, to police the implementation of the decrees for repeated or new violations of the injunctive provisions, and furthermore that the government shall be entitled to treat such suspected violations as new violations of Title VII and/or Executive Order 11246, by reason of which the government shall not be barred from bringing the matter to the attention of the district court for new injunctive correction, if necessary. Correspondingly, in light of the parties' stipulation as to the scope of the district court's continuing jurisdiction, we construe paragraph 20 of Consent Decree I as authorizing any aggrieved individual to proceed in similar fashion. If the grievance arises from a transaction or episode to which the injunctive provisions of the decrees apply, then we understand that the individual may approach the court directly.[9] If the grievance involves an allegation of new discrimination occurring subsequent to entry date, then it is our understanding that the individual may file a charge with the EEOC, and/or a lawsuit if he or she chooses, and expect the same quality of administrative and judicial consideration to which an employment discrimination complainant would be entitled in any other American industry.
 
 
 25
 Having sketched by no means exhaustively the terms of the settlement, the parties' interpretation thereof, and our general understanding of what the parties intended by their words and deeds, we turn now to the adversary environment which produced these appeals.
 
 
 26
 II. PRIVATE INTERVENTION: COMPLAINTS, PROCEEDINGS, AND APPEALS
 
 
 27
 The consent decrees were entered on April 12, 1974. By May 17, 1974, three organizations, four individuals, and six groups[10] of plaintiffs in actions pending before various district courts had moved to intervene and to vacate the decrees. The district court invited the movants to file briefs, offer proof, and make oral arguments at the hearing conducted on May 20. At the conclusion of the hearing, the court narrowed the issues in intervention to two points: (1) whether the decrees should be stayed or vacated as unlawful or improper in their entirety; and (2) the validity of the contemplated releases of claims for additional relief in connection with the payment of back pay to employees so electing under the consent decrees.
 
 
 28
 The district court granted intervention as of right, intendedly pursuant to § 706(f)(1) of Title VII, 42 U.S.C. § 2000e-5(f)(1), and F.R.Civ.P. 24(a)(1), to a group of thirty-six individuals with respect to whom charges of discrimination on the part of the defendants had been filed with the EEOC. Thirty-three of these individuals were members of the Harris group. The court also granted permissive intervention under F.R.Civ.P. 24(b) to the principal officer of the Rank and File Team, an organization composed of rank and file members of the Steelworkers' Union. Judge Pointer denied all other motions for intervention, including that filed by the National Organization of Women (NOW), appellant herein. Among the thirty-six persons as to whom the court allowed intervention by right, however, three were women specifically appointed by NOW at Judge Pointer's request, and represented by NOW's counsel throughout the proceedings.[11]
 
 
 29
 In his memorandum opinion of June 7, 1974, see 63 F.R.D. 1, 5, Judge Pointer refused to stay or vacate the consent decrees and upheld their validity against the intervenors' attacks. He determined first that no evidentiary hearing was needed, since the intervenors sought mainly to present legal hypotheses and argument rather than evidence. Next, the court rejected contentions that the government had abdicated or bargained away its responsibilities under Title VII and Executive Order 11246. While recognizing that the decrees may require authoritative construction and clarification from time to time, Judge Pointer deemed such potential difficulties within his control by virtue of the court's continuing jurisdiction. With respect to the alleged illegality of the back pay settlement releases, Judge Pointer defined the issue as "whether a signed release in exchange for the payment of back-pay determined under a settlement procedure, as contemplated in paragraph 18(g) of Consent Decree I, can be valid as a matter of public policy." Id. at 7. Relying on recent language by the Supreme Court,[12] he held in the affirmative, provided the employee's consent is both " 'voluntary and knowing,' " with "adequate notice which gives the employee full possession of the facts." Id.
 
 
 30
 As a procedural matter, Judge Pointer also relaxed his earlier orders denying intervention to the majority of the movants. The final memorandum of June 7 denies such intervention without prejudice to the rights of private parties to seek further intervention as to questions which may arise in the future. Similarly, whereas Judge Pointer considered his opinion binding upon those to whom he granted intervention as to the issues therein determined, he stated explicitly that he did not consider any private intervenor or class of private parties bound by principles of res judicata to the consent decrees. Id. at 4 n. 2, 5.
 
 
 31
 NOW appeals the district court's refusal to allow intervention by the organization qua organization. It has also filed a brief and presented oral argument on the merits in behalf of the three female appellants to whom Judge Pointer granted intervention. The intervenors from the Harris group appeal the district court's judgment sustaining the overall legality of the consent decrees, although they complain primarily about the back pay features rather than the decrees' injunctive provisions. No other appeals are properly before this court.[13] For the reasons which follow, we affirm the judgment of the district court insofar as it rejected the contentions of the Harris intervenors and the three females nominated by NOW. We dismiss the appeal of NOW qua organization for want of jurisdiction.
 
 III. DENIAL OF NOW'S MOTION TO INTERVENE
 
 32
 Logical analysis of any question concerning intervention in federal court begins with Rule 24 of the Federal Rules of Civil Procedure.[14] The rule establishes ground rules for two categories of intervention: section (a) establishes the procedures for timely intervention as of right, whereas section (b) recognizes discretion in the district court to permit intervention in two specified situations, again upon timely application.
 
 
 33
 Besides timeliness, Rule 24 details other preconditions to intervention. Under section (a), intervention as of right is authorized (1) when an act of Congress confers an unconditional right to intervene, or (2) when the applicant claims an interest in the subject matter of the action and shows that the action's disposition may, as a practical matter, impair or impede the ability to protect that interest, unless the applicant's interest is adequately protected by other parties to the suit. Thus, (a)(1) intervention presupposes reliance on a statute. By contrast, the inquiry under subsection (a)(2) is a flexible one, which focuses on the particular facts and circumstances surrounding each application. Since 1966, we have consistently held that (a) (2) intervention as of right must be measured by a practical rather than technical yardstick. E. g., Martin v. Travelers Indem. Co., 5 Cir. 1971, 450 F.2d 542, 554; Diaz v. Southern Drilling Corp., 5 Cir. 1970, 427 F.2d 1118, 1123-25, cert. denied sub nom., Trefina A.G. v. United States, 400 U.S. 878, 91 S.Ct. 118, 27 L.Ed.2d 115 (1970); Atlantis Development Corp. v. United States, 5 Cir. 1967, 379 F.2d 818, 822-29. A denial of an application for intervention by right which was timely filed, as here, is subject to the usual scope of our appellate review over questions of law. An erroneous denial will be reversed. Weiser v. White, 5 Cir. 1975, 505 F.2d 912, at p. 916. On the other hand, if the appellate court finds that the claim of right to intervene was without merit, then it must dismiss the appeal for want of jurisdiction, since the order denying intervention does not constitute a final judgment. Id. See also C. Wright, Federal Courts § 75, at 332 (1970).
 
 
 34
 The rules pertaining to permissive intervention are slightly different. Rule 24(b) authorizes permissive intervention (1) when a federal statute confers a conditional right to intervene, or (2) when the application raises a question of law or fact which is material to the main action. In exercising its discretion, the district court is required to consider whether permissive intervention would unduly jeopardize or delay the determination of the original suit. On appeal, the denial of a motion for permissive intervention is unreviewable, unless the trial court abused its discretion. Brotherhood of R. R. Trainmen v. Baltimore & Ohio R. R., 331 U.S. 519, 524, 67 S.Ct. 1387, 1390, 91 L.Ed. 1646, 1650 (1947); Martin v. Kalvar Corp., 5 Cir. 1969, 411 F.2d 552. If no abuse of discretion is demonstrated, then once again the district court's order is not appealable and we must dismiss the appeal for want of a final order. Weiser v. White, supra ; C. Wright, supra.
 
 
 35
 NOW's principal contention asserts an absolute, unconditional right of intervention in favor of the organization. NOW thus seeks to enter the lawsuit under Rule 24(a)(1). NOW argues that this absolute, unconditional right is conferred upon it by § 706(f)(1) of Title VII, as amended, Pub.L.No.92-261, § 4(a) (March 24, 1972), 42 U.S.C. § 2000e-5(f)(1). Section 706(f)(1), which, as pertinent, contains the procedures for filing charges with the EEOC and the filing of lawsuits by the Commission or charging parties when conciliation fails, confers upon the "person or persons aggrieved" a right to intervene in a civil action brought thereunder by the Commission. NOW contends that since it is a civil rights-oriented feminist organization which has been permitted on occasions to file charges with the EEOC on behalf of women, and since on at least one occasion it has been named as a party-plaintiff in a sex discrimination lawsuit,[15] it should therefore be deemed a "person aggrieved" in its own stead. NOW argues that judicial recognition of an unconditional organizational right of intervention would yield socially desirable results, since the organization would receive valuable stature and publicity which would encourage female workers throughout the nation to seek its assistance.
 
 
 36
 Without drawing any finer distinctions, the district court held that NOW is not a "person aggrieved" within the meaning of § 706(f)(1). In the court's view, NOW did not demonstrate a sufficiently concrete interest qua organization to justify the additional problems of management and inconvenience to other parties (including, presumably, the beneficiary employees of the consent decrees) that might result from duplicative intervention. The fact that NOW previously had been permitted to designate three female intervenors, whom its counsel ably represented, weighed heavily in Judge Pointer's calculus. See 63 F.R.D. at 4.
 
 
 37
 While perhaps a court might be persuaded by Judge Pointer's conclusion that NOW is not a "person aggrieved" within the meaning of § 706(f)(1),[16] we defer decision of that question in favor of an approach which we consider more directly dispositive. We hold that this was not a proper case for intervention as of right by any private party or organization pursuant to Rule 24(a)(1). Specifically, we hold that intervention as of right was not conferred in this proceeding by any act of Congress. We do so because it is plain from a careful examination of the government's complaint that this was not in substance a § 706 action, but rather a "pattern or practice" action authorized by § 707, 42 U.S.C. § 2000e-6, which the EEOC was empowered to institute by virtue of the transfer of functions outlined in § 707(c).[17] Insofar as the United States and the Secretary of Labor joined as plaintiffs to enforce the obligations imposed on the defendants by Executive Order 11246, the district court's jurisdiction was based on 28 U.S.C. § 1345.[18]
 
 
 38
 Nothing in § 707 or in any other federal statute conferred an unconditional right of intervention upon any private individual or association thereof. The "pattern or practice" action under § 707, which is conspicuously silent in regard to intervention, must be carefully contrasted with the actions contemplated by § 706. Under § 707, the EEOC (formerly the Attorney General) may institute a "pattern or practice" suit anytime that it has "reasonable cause" to believe such a suit necessary. See United States v. Jacksonville Terminal Co., 5 Cir. 1971, 451 F.2d 418, 438, cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972). Section 707 does not make it mandatory that anyone file a charge against the employer or follow administrative timetables before the suit may be brought. It was unquestionably the design of Congress in the enactment of § 707 to provide the government with a swift and effective weapon to vindicate the broad public interest in eliminating unlawful practices, at a level which may or may not address the grievances of particular individuals. See Rodriguez v. East Texas Motor Freight, 5 Cir. 1974, 505 F.2d 40, at p. 66; United States v. International Ass'n. of Bridge, Structural, and Ornamental Iron Workers, 7 Cir. 1971, 438 F.2d 679, cert. denied 404 U.S. 830, 92 S.Ct. 75, 30 L.Ed.2d 60 (1971). Rather, it is to those individual grievances that Congress addressed § 706, with its attendant requirements that charges be filed, investigations conducted, and an opportunity to conciliate afforded the respondent when "reasonable cause" has been found. On the other hand, the mere fact that some charges were filed, or that efforts were made toward conciliation, does not in our view transform what the government may properly bring and does bring as a § 707 "pattern or practice" action into a § 706 action. See United States v. Ironworkers Local 86, 9 Cir. 1971, 443 F.2d 544, 551-52, cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971).
 
 
 39
 We have studied closely the language of the two sections in reaching the foregoing conclusions. If only the words of the statute were available, one might plausibly argue that § 707(e), 42 U.S.C. § 2000e-6(e), incorporates § 706(f)(1) intervention as of right into "pattern or practice" procedure. Section 707(e), enacted as another of the 1972 amendments to Title VII, provides that the EEOC shall have the authority, subsequent to March 24, 1972, "to investigate and act on" charges of pattern or practice discrimination filed in behalf of aggrieved individuals. Section 707(e) concludes: "All such actions shall be conducted in accordance with the procedures set forth in section 2000e-5 (§ 706) of this title."
 
 
 40
 Arguably, these procedures include intervention as of right by aggrieved parties. The legislative history indicates otherwise, however, and in the absence of an express provision for intervention we choose to follow its signals. In the first place, we have discovered no legislative history evincing a favorable congressional attitude toward unconditional private intervention in government "pattern or practice" litigation. In the legislative history which speaks most closely to the point, the House Committee on Education and Labor described the enacted precursor to § 707(e) as a measure which merely "(a)ssimilate(d) procedures for new proceedings brought under Section 707 to those now provided for under Section 706 so that the Commission may provide an administrative procedure to be the counterpart of the present Section 707 action." (emphasis added).[19] Thus, while Congress apparently intended that the EEOC have investigative and conciliatory authority in "pattern or practice" situations comparable to its existing powers in § 706 cases, there is no indication that Congress intended the duplication of procedures to extend beyond the administrative level. The EEOC, of course, may not enact statutes, and it is a statute that Rule 24(a)(1) requires.
 
 
 41
 We emphasize that our disposition of the 24(a)(1) aspect of the intervention question is based primarily on what we find to be the correct construction of § 707 and its legislative history. We are comforted, however, by the Seventh Circuit's recent decision in EEOC v. United Air Lines, 7 Cir. 1975, 515 F.2d 946, in which the court reached the same conclusion, though ultimately its affirmance was based on the untimeliness of the intervenors' application. Also, we find persuasive support for our refusal to effectively imply an unconditional statutory right in the strong judicial policy against nonexpress private intervention in government enforcement litigation when an adequate private remedy is freely accessible. See, e. g., Sam Fox Publishing Co. v. United States, 366 U.S. 683, 81 S.Ct. 1309, 6 L.Ed.2d 604 (1961). See also Battle v. Liberty Nat'l. Life Ins. Co., 5 Cir. 1974, 493 F.2d 39, 52, cert. denied, 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975). This policy likewise applies to applications for intervention by right under Rule 24(a)(2), and applications for permissive intervention under Rule 24(b). See SEC v. Everest Mgt. Corp., 2 Cir. 1972, 475 F.2d 1236; United States v. Automobile Mfrs. Assn., C.D.Cal.1969, 307 F.Supp. 617, 619, aff'd per curiam, 397 U.S. 248, 90 S.Ct. 1105, 25 L.Ed.2d 280 (1970). Cf. NAACP v. New York, 413 U.S. 345, 368, 93 S.Ct. 2591, 2604, 37 L.Ed.2d 648, 664 (1973).
 
 
 42
 Without any aim on our part to denigrate whatever social benefit may accrue from participation in the proceedings by organizations such as NOW, or to impugn NOW's motives or sincerity, we note that NOW has offered no commanding legal or policy arguments to warrant a rule allowing its intervention as of right. NOW places much reliance on EEOC v. American Tel. & Tel. Co., E.D.Pa.1973, 365 F.Supp. 1105, aff'd in part, appeals dismissed in part, 3 Cir. 1974, 506 F.2d 735. There the court granted intervention by right, under § 706(f)(1) and Rule 24(a)(1), to a labor union insofar as certain issues raised in the union's application related to grievances with respect to which charges had been filed with the EEOC, and to remedy which the Commission had filed a suit that led to an industry-wide consent decree. American Tel. & Tel., however, was a suit brought by the Commission pursuant to § 706. It was not a § 707 "pattern or practice" action. See 506 F.2d at 740. The issue before the court was whether the union could be considered an "aggrieved" party for purposes of § 706(f)(1). The case is not authority for the proposition sought to be established sub judice. At any rate, we think that a labor union which is party to the collective bargaining agreement presents a far stronger case for intervention than does an organization such as NOW, provided that conflicts of interest are minimized.[20]
 
 
 43
 In summary, we have determined that NOW enjoyed no unconditional statutory right to intervene under F.R.Civ.P. 24(a)(1). The matter is mostly ended at this point, but we pause briefly to consider whether the district court could have erred in refusing to grant NOW intervention under Rule 24(a)(2) or (b). With respect to (a)(2) intervention as of right, NOW obviously claims an interest in the subject matter of the action. We believe, however, that NOW fails the other two prongs of the test. NOW has not shown that the district court's decision to enter the consent decrees as between the government and the defendants may, as a practical matter, operate to impair or impede the protection of its interest. Neither NOW nor any of its members is bound by res judicata or estoppel to the consent decrees. See Rodriguez v. East Texas Motor Freight, 5 Cir. 1974, 505 F.2d 40 at p. 65; Williamson v. Bethlehem Steel Corp., 2 Cir. 1972, 468 F.2d 1201, 1203, cert. denied, 411 U.S. 931, 93 S.Ct. 1893, 36 L.Ed.2d 390 (1973). See also Sam Fox Publishing Co. v. United States, supra, 366 U.S. at 689-90, 81 S.Ct. at 1313, 6 L.Ed.2d at 609. Furthermore, the district court explicitly qualified the denial of intervention as a denial without prejudice to future intervention. Cf. NAACP v. New York, supra. Finally, plenary legal remedies remain fully available to NOW's membership and perhaps, or so NOW has asserted, to the organization itself.[21] The policy against private intervention in government litigation, noted supra, militates against the allowance of (a)(2) intervention here; NOW makes no colorable showing of inadequacy in the government's representation of the public interest. In any event, NOW fails the third element of the (a)(2) test. Having participated through its nominees and counsel during these entire proceedings, NOW cannot be heard to complain of the adequacy of the feminist representation.
 
 
 44
 Insofar as NOW's application may be deemed to have sought permissive intervention under Rule 24(b), no abuse of discretion has been shown in the denial. The district court was clearly justified in determining that the interests of the majority of the affected individuals predominated over NOW's interest in further delaying implementation of the decrees' reforms. Such determinations must be viewed in light of the circumstances as they existed at the time. EEOC v. United Air Lines, supra, 515 F.2d at 949. In this case, a full hearing had been held and NOW had received ample opportunity to present its arguments. The court below did not err in denying further intervention. Consequently, NOW's appeal qua organization must be dismissed.[22]
 
 
 45
 III. THE APPEALS ON THE MERITS: CHALLENGES TO THE CONSENT DECREES
 
 A. Scope of Review
 
 46
 Before proceeding with our examination of the appellants' numerous and provocative challenges to the consent decrees, it is appropriate that we outline the rules of law which govern the parameters of our review. Initially, it cannot be gainsaid that conciliation and voluntary settlement are the preferred means for resolving employment discrimination disputes. As early as 1968, Judge Bell wrote for this court: "It is thus clear that there is great emphasis in Title VII on private settlement and the elimination of unfair practices without litigation." Oatis v. Crown Zellerbach Corp., 5 Cir. 1968, 398 F.2d 496, 498 (emphasis added). Subsequently, in Dent v. St. Louis-San Francisco Ry. Co., 5 Cir. 1969, 406 F.2d 399, 402, Judge Coleman advanced the same thesis:
 
 
 47
 Thus it is quite apparent that the basic philosophy of these statutory provisions is that voluntary compliance is preferable to court action and that efforts should be made to resolve these employment rights by conciliation both before and after court action.
 
 
 48
 (emphasis added). In Culpepper v. Reynolds Metals Co., 5 Cir. 1970, 421 F.2d 888, 891, we declared that "the central theme of Title VII is 'private settlement' as an effective end to employment discrimination," citing Oatis. Next, in Hutchings v. United States Industries, Inc., 5 Cir. 1970, 428 F.2d 303, 309, Judge Ainsworth stated:
 
 
 49
 (I)t is clear that Congress placed great emphasis upon private settlement and the elimination of unfair practices without litigation (citing Oatis ) on the ground that voluntary compliance is preferable to court action. (citing Dent ). Indeed, it is apparent that the primary role of the EEOC is to seek elimination of unlawful employment practices by informal means leading to voluntary compliance.
 
 
 50
 (emphasis added).[23]
 
 
 51
 Our recent excursions into this area have not detoured from the foregoing principles, but have emphasized instead their practical value. In the most sweeping of all our employment discrimination decisions, Pettway v. American Cast Iron Pipe Co., 5 Cir. 1974, 494 F.2d 211, 258, we said in regard to the firmly established, but nonetheless thorny and speculative matter of awarding classwide back pay:
 
 
 52
 Initially, we approve the district court's intention of referring the back pay claims to a Special Master, Fed.R.Civ.P. 53. United States v. Wood, Wire & Metal Lathers Int. Union, Local 46, 328 F.Supp. 429, 441 (S.D.N.Y.1971). However, the court and the parties may also consider negotiating an agreement. E. g., Johnson v. Goodyear Tire & Rubber Co., 349 F.Supp. 3, 18 (S.D.Tex.1972), 491 F.2d 1364 (5th Cir. March 27, 1974); United States v. Wood, Wire & Metal Lathers, Int. Union, Local 46, supra 328 F.Supp. at 444 n. 3. An alternative is to utilize the expertise of the intervening Equal Employment Opportunity Commission to supervise settlement negotiations or to aid in determining the amount of the award.
 
 
 53
 (emphasis added).
 
 
 54
 Nor has the Supreme Court maintained detached silence in regard to the deference courts should accord the processes of voluntary conciliation and settlement. Describing Title VII and the functions of the EEOC, Mr. Justice Powell in Alexander v. Gardner-Denver Co., 415 U.S. 36, 44, 94 S.Ct. 1011, 1017-18, 39 L.Ed.2d 147, 156 (1974), wrote for the Court:
 
 
 55
 Cooperation and voluntary compliance were selected as the preferred means for achieving (the elimination of unlawful employment discrimination). To this end, Congress created the Equal Employment Opportunity Commission and established a procedure whereby State and local equal employment opportunity agencies, as well as the Commission, would have an opportunity to settle disputes through conference, conciliation, and persuasion before the aggrieved party was permitted to file a lawsuit. In the Equal Employment Opportunity Act of 1972, Pub.L. 92-261, 86 Stat. 103, Congress amended Title VII to provide the Commission with further authority to investigate individual charges of discrimination, to promote voluntary compliance with the requirements of Title VII, and to institute civil actions against employers or unions named in a discrimination charge.
 
 
 56
 (emphasis added). In Gardner-Denver the Supreme Court stressed the importance of voluntary settlement in voicing its disapproval of a policy of deferral to binding arbitration. In the Court's view, such a policy could adversely affect the arbitration system as well as the vindication of individual rights, since the employee fearful of the arbitral forum might elect to bypass arbitration and file a lawsuit instead. "The possibility of voluntary compliance or settlement of Title VII claims would thus be reduced, and the result could well be more litigation, not less." 415 U.S. at 59, 94 S.Ct. at 1025, 39 L.Ed.2d at 164. (emphasis added).
 
 
 57
 So far, we have emphasized only one side of the coin the side which places a premium on the achievement of voluntary compliance. In doing so, we have not overlooked that the "final responsibility for enforcement of Title VII is vested with federal courts," Gardner-Denver, supra, 415 U.S. at 44, 94 S.Ct. at 1018, 39 L.Ed.2d at 156, and that "Congress gave private individuals a significant role in the enforcement process of Title VII." Id. See also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).[24] Nor have we forgotten that "the private right of action remains an essential means of obtaining judicial enforcement of Title VII." Gardner-Denver, supra, 415 U.S. at 45, 94 S.Ct. at 1018, 39 L.Ed.2d at 156 (emphasis added), and cases cited. We are fully mindful, moreover, that the EEOC's limited resources permit it to undertake serious conciliation or lawsuits in only a small fraction of the cases on its docket.[25] For that reason, the congressional scheme continues to depend in substantial measure upon "private attorneys general" who, through their lawsuits in the federal courts, elicit enunciation of the great bulk of policies and principles which serve to flesh out the basic congressional mandate.
 
 
 58
 Yet we deal here with one of those rare instances in which the government has, to its satisfaction, successfully negotiated a comprehensive voluntary accord. At least ostensibly, the government has done precisely what it ought to do as a matter of public policy in order to vitiate the need for additional industry-wide litigation. On the other hand, the product of the considerable efforts on behalf of the government, the steel companies, and the union does not purport to foreclose any alternatives that may otherwise exist for individuals who had rather litigate than participate in the entire settlement.[26] We say entire because the injunctive relief provided by the consent decrees extends to all affected steelworkers, regardless whether they elect to accept the back pay and execute the releases. The question at this point, then, is through what lens do we judge the adequacy of the settlement as against the intervenors' objections, bearing in mind that Congress and the Supreme Court have expressed a preference for voluntary compliance above all other tools of enforcement?
 
 
 59
 We think the answer was delivered nearly fifteen years ago by Judge (now Chief Judge) Brown in Florida Trailer and Equipment Co. v. Deal, 5 Cir. 1960, 284 F.2d 567, in which an objecting creditor sought to void a referee and district court-approved settlement, reached pursuant to the Bankruptcy Act, between the trustee of the insolvent estate and a lien creditor. There we stated:
 
 
 60
 Of course, the approval of a proposed settlement does not depend on establishing as a matter of legal certainty that the subject claim or counterclaim is or is not worthless or valuable. The probable outcome in the event of litigation, the relative advantages and disadvantages are, of course, relevant factors for evaluation. But the very uncertainty of outcome in litigation, as well as the avoidance of wasteful litigation and expense, lay behind the Congressional infusion of a power to compromise. This is a recognition of the policy of the law generally to encourage settlements. This could hardly be achieved if the test on hearing for approval meant establishing success or failure to a certainty. Parties would be hesitant to explore the likelihood of settlement apprehensive as they would be that the application for approval would necessarily result in a judicial determination that there was no escape from liability or no hope of recovery and hence no basis for a compromise.
 
 284 F.2d at 571. Judge Brown continued:
 
 61
 Obviously, it would not be a settlement if to obtain approval the Trustee would have to demonstrate that he could not succeed had the preference claim been pressed. All that he must do is establish to the reasonable satisfaction of the Referee that, all things considered, (citation omitted), it is prudent to eliminate the risks of litigation to achieve specific certainty though admittedly it might be considerably less (or more) than were the case fought to the bitter end. * * *
 
 
 62
 Id. at 573 (emphasis added).
 
 
 63
 Despite the appearance of an occasional contextual gloss,[27] the approach to judicial evaluation of proposed settlements announced in Deal has drawn firm adherents among the federal courts. See City of Detroit v. Grinnell Corp., 2 Cir. 1974, 495 F.2d 448, 455-56 (objectors must show clear abuse of discretion in trial court's approval of settlement); Bryan v. Pittsburgh Plate Glass Co., 3 Cir. 1974, 494 F.2d 799, 803, cert. denied, Abate v. Pittsburgh Plate Glass Company, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974) (settlement not unfair simply because many class members oppose it); Greenspun v. Bogan, 1 Cir. 1974, 492 F.2d 375, 381 (only where one side is so clearly correct that offer in compromise becomes clearly unreasonable does trial court abuse discretion in approving settlement); Ace Heating & Plumbing Co., Inc. v. Crane Co., 3 Cir. 1971, 453 F.2d 30, 34 (great weight is accorded the trial judge's views); West Virginia v. Chas. Pfizer & Co., 2 Cir. 1971, 440 F.2d 1079, 1085-86, cert. denied, see footnote 27, supra, (appellate court will disturb settlement approval only upon clear showing of abuse of discretion). See also Young v. Katz, 5 Cir. 1971, 447 F.2d 431.
 
 
 64
 Applying the Deal approach to the issues before us, we align ourselves with certain propositions which were recently developed by the Second Circuit in its review of a similar, though less expansive, Title VII settlement, see Patterson v. Newspaper and Mail Deliverers' Union of New York and Vicinity, 2 Cir. 1975, 514 F.2d 767. In the first place, the scope of our review is narrow and we should interfere with the implementation of the consent decrees only upon a clear showing that the district judge abused his discretion by approving the settlement. Next, to the extent that the settlement may in occasional respects arguably fall short of immediately achieving for each affected discriminatee his or her "rightful place," we must balance the affirmative action objectives of Title VII and Executive Order 11246 against the equally strong congressional policy favoring voluntary compliance. The appropriateness of such balancing is especially clear, as here, "in an area where voluntary compliance by the parties over an extended period will contribute significantly toward ultimate achievement of statutory goals." 514 F.2d at 771. Nor should we substitute our notions of fairness and adequacy of the relief for those of the parties and Judge Pointer, absent a strong showing that the district court failed to satisfy itself of the settlement's overall fairness to beneficiaries and consistency with the public interest. Finally, and of utmost importance, we are without authority to modify or rewrite the parties' agreement. Our only alternative, if it were shown that Judge Pointer abused his discretion or overlooked an illegal provision, would be to vacate his approval of the entire settlement and remand for trial of the government's "pattern or practice" complaint. See United States v. Atlantic Ref. Co., 360 U.S. 19, 23, 79 S.Ct. 944, 946, 3 L.Ed.2d 1054, 1057 (1959); Patterson, supra, 514 F.2d at 772. Cf. United States v. Blue Chip Stamp Co., C.D.Cal.1967, 272 F.Supp. 432, 440, aff'd per curiam sub nom., Thrifty Shoppers Scrip Co. v. United States, 389 U.S. 580, 88 S.Ct. 693, 19 L.Ed.2d 781 (1968).
 
 
 65
 To the foregoing observations we add a few remarks which we think are particularly pertinent to these appeals. The central issue here is not whether the consent decrees achieve some hypothetical standard constructed by imagining every benefit that might someday be obtained in contested litigation. The question which we must decide is whether the responsible government agencies may lawfully conciliate and settle by consent decree charges of discrimination cutting across an entire industry in a manner which assures cooperative defendants that they will not face future government lawsuits on those claims, and which accords the defendants the opportunity to offer final satisfaction to aggrieved individuals who are willing to accept tenders of back pay and execute the releases. Throughout their arguments, the appellants imply that private suits by thousands of unspecified employees whose grievances are generally covered by the decrees would be virtually certain to achieve far better results than those obtained by the government. Yet this implication, stripped of its rhetoric, goes really only to back pay insofar as the Harris appellants are concerned. Those appellants have challenged seriously the adequacy of the decrees' injunctive measures neither in the district court nor in this court.[28] Only the three female appellants have done so, and their contentions though they certainly suggest possibilities do not approach any stretch of certainty. Against the overwhelmingly speculative advantage that might accrue to a small number of aggrieved persons if the decrees were vacated must be weighed the certain loss to all of the immediate injunctive benefits and the unimpeded opportunity to receive some back pay today instead of after months or years of litigation. Additional losses which must be considered include the nation's investment in the resources consumed by the federal agencies in negotiating these decrees, as well as the chance justly to finalize a matter that otherwise would burden agencies and courts and continue to disrupt an industry vital to the nation's security for years to come. We proceed now to examine specific issues raised by the appellants.
 
 B. Alleged Illegality of Back Pay Releases
 
 66
 The subject of back pay is treated in paragraph 18 of Consent Decree I. The parties to the decree begin with the understanding that disagreement exists over whether any affected employee is entitled to back pay, and if so how much. Paragraph 18 continues:
 
 
 67
 In final resolution of that dispute and in full compensation for all alleged injuries suffered by such (aggrieved eligible employees) by reason of any unlawful acts and practices within the scope of the complaint or this Decree, as well as any future claim of damages by reason of the continuance of the effects of such past discriminatory acts and practices, all of the parties have agreed as follows:
 
 
 68
 (g) The amount of back pay determined to be due to each affected employee[29] shall be tendered to him in accordance with procedures established by the Audit and Review Committee. In order to receive such back pay, each affected employee shall be required to execute a release, in a form approved by the Audit and Review Committee, of any claims against or liability of the Company, the Union, their officers, directors, agents, local unions, members, employees, successors and assigns, resulting from any alleged violations based on race, color, sex (exclusive of the matters referred to in paragraph D of this Decree), or national origin, occurring on or before the date of entry of this Decree, of any equal employment opportunity laws, ordinances, regulations or orders, including but not limited to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., the Civil Rights Act of 1866, 42 U.S.C. § 1981 et seq., Executive Order 11246, as amended, the United States Constitution, the duty of fair representation under the Labor Management Relations Act, 29 U.S.C. § 151 et seq., and any other applicable federal, state or local constitutional or statutory provisions, orders or regulations. Such release will also bar recovery of any damages suffered at any time after the date of entry of this decree by reason of continued effects of any such discriminatory acts which occurred on or before the date of entry of this Decree.[30]
 
 
 69
 All appellants attack the legality and efficacy of the quoted provision on a variety of grounds. They argue that paragraph 18(g) unlawfully forces minority and female employees to waive their statutory right to bring private actions as a condition of obtaining any relief in a government "pattern or practice" suit. Alternatively, they argue that the release constitutes an illegal prospective waiver of the employee's Title VII rights. They contend next that the release interferes with the employee's right to seek independent remedies, a right which they assert may not be compromised as a matter of public policy. Moreover, the appellants maintain that the back pay fund is grossly inadequate by comparison with the recoveries that could be had in contested litigation, and hence that the decrees are plainly unfair to minority and female employees.
 
 
 70
 Eschewing as premature any ruling on the validity of any particular employee's release, the district court concluded that the appellants' arguments were lacking in merit as attacks on the decrees as a whole. Judge Pointer held that "there can be a legal waiver of back-pay claims where, for valuable consideration, a release is signed knowingly and voluntarily, with adequate notice which gives the employee full possession of the facts."[31] We agree, but in order to delineate more precisely the contours of the applicable rule of law, we hold that the employee may release not only claims for additional back pay, but also claims for other relief including injunctive provided the released claims arise from antecedent discriminatory events, acts, patterns, or practices, or the "continuing" or "future" effects thereof so long as such effects are causally rooted in origin, logic, and factual experience in discriminatory acts or practices which antedate the execution of the release, and provided, of course, that the release is executed voluntarily and with adequate knowledge, as described by Judge Pointer.
 
 
 71
 Reduced to their simplest terms, the items to be released by electing employees pursuant to paragraph 18(g), in return for back pay, are: (1) all claims (subject to an exception not now germane) asserting unlawful employment discrimination by the defendants and/or their agents or privies insofar as such claims are based on acts or practices, within the scope of the government's complaint or the consent decrees, which were completed on or before the date of the decrees' entry; and (2) claims for damages incurred at any time because of continued effects of complaint or decree-covered acts or practices which took place on or before the entry date of the consent decrees.
 
 
 72
 There are certain potential rights, however, with respect to which we do not understand paragraph 18(g) to envision a compromise. That is because a waiver of these rights either does not follow from a fair reading of paragraph 18(g) (number (1)), or else they are "prospective" and employees may not waive them (numbers (2) and (3)). We list them as follows:
 
 
 73
 (1) The release will not bar an employee from suing in the future for additional injunctive relief if the reforms contemplated by the decrees do not eliminate continued effects which are causally grounded in past acts or practices of discrimination. For example, suppose a minority or female employee had been assigned to a lowly job in an undesirable LOP or pool at some point prior to April 12, 1974. At that point the employee became "locked" into a departmental seniority system whereby, in bidding for more desirable vacancies in other departments against white males with less plant seniority, the minority or female employee would be denied the new job for want of superior departmental seniority, though qualifications were otherwise equal. As of the decrees' entry, the aggrieved employee suddenly obtained plantwide seniority, and at minimum the right to bid for entry-level jobs in other departments on that basis. See paragraph 7 of Consent Decree I. Suppose, then, that subsequent to April 12, 1974 the aggrieved employee successfully bids for an entry-level job in a new department which offers substantial opportunity for advancement, perhaps to a trade or craft department. Because of his or her basic qualifications and superior plantwide seniority, however, the employee feels that a higher job in the unit should have been awarded instead of the entry-level position. Yet at his or her plant the general rule is ethnically and sexually neutral three-step bidding under paragraph 7(a). We are aware of no feature of the release which would preclude this employee from filing a charge with the EEOC, and/or an eventual lawsuit, seeking suspension of three-step bidding at the plant, at least in his or her case. To the extent the plant's transfer procedure restrains otherwise qualified, plant-senior minorities and females from reaching their "rightful places," then it may perpetuate the effects of past discrimination. See Stevenson v. International Paper Co., 5 Cir. 1975, 516 F.2d 103, at pp. 114, 116. We emphasize may because the answer is not now available; it will depend on the manner in which future circumstances and business necessities develop. Of course, regardless of the success or failure of the employee's challenge to the transfer procedure, his or her release may be pled in bar to a claim for damages based on whatever effects of past discrimination the procedure might have continued while it existed. This variety of grievance is precisely the kind to which the decrees are directed present effects of former systemic discrimination. The decrees may quickly remedy such problems, if they are given a chance.
 
 
 74
 (2) Any employee who feels aggrieved by the defendants' palpable disobedience of the terms of the decrees may sue, in effect, to enforce them. Although the defendants' promise to comply runs directly to the government, rather than to employees, the defendants readily concede that an episode of nonadherence to the decrees may conceivably constitute a new violation of the law and give rise to a new cause of action under Title VII or other applicable law. Whether a particular instance of noncompliance may give rise to a new claim for damages, injunctive relief, or perhaps both or neither, will again depend on the circumstances. If, for example, a minority or female individual could show that the company failed to fulfill an affirmative action goal for promotion to higher-paying trades and crafts, see paragraph 2(a)(1) of the Agreement accompanying Consent Decree II; that such failure was due to discrimination; and that he or she was qualified and would have been promoted at an earlier date but for the discrimination, then arguably the employee would be entitled to the first promotional vacancy and some amount of money for the period during which promotion was denied. On the other hand, the company may be able to show that no one was promoted during the relevant period, or that the promotions which did occur were based on unusual needs or other business necessities. Under those circumstances the employee may be entitled, if at all, to no more than a right of first refusal when the next vacancy occurs.
 
 
 75
 (3) Clearly apart from compliance or noncompliance with the decrees, the release cannot preclude a suit for any form of appropriate relief for subsequent injuries caused by future acts or undertakings the effects of which are equivalent to the otherwise compromised, noncompensable effects of past discriminations covered by the complaint or the decrees. Thus, the defendants are responsible for their conduct relating to job assignments, tests, qualification requirements, transfers, layoffs, and collective bargaining to the extent these items are carried out after April 12, 1974. If the defendants engage in new discrimination (of course, they deny that they have engaged in any heretofore), they will be fully liable for its provable effects and for provable economic losses caused thereby, regardless whether complaining employees signed releases as to other claims. Thus, it essentially appears that all an employee really waives in terms of "continued effects" by signing a release is his or her speculative accrual of further damages due to the inconceivable possibility that the defendants would take no corrective action whatsoever subsequent to the entry of the consent decrees. Obviously they may not sit still for long, or they will be in contempt or perhaps the warm waters of private litigation if their inaction breaches an express obligation which they have assumed under the decrees.
 
 
 76
 This last aspect of the release can have no other acceptable meaning, for notwithstanding that the systemic reforms contained in the decrees have been put into operation, thereby undertaking to break the chains of past causation as it were, the defendants have an ongoing statutory responsibility independent of the decrees to see that the corrective measures and goals established thereunder are maintained and updated so that the effects of past discrimination will be wiped out as quickly as due diligence and business necessity permit. See Pettway, supra, 494 F.2d at 248. This is especially the case with regard to the elimination of discriminatory departmental seniority structures, tests, and other customs that can unlawfully restrict the mobility of minorities and females within and between LOPs. On the other hand, neither the decrees nor the laws impose upon the defendants an impossible burden to insure that each victim arrives at his or her "rightful place" at once. In cases like this, involving large numbers of workers, it can rarely be determined how much a given employee would have earned or what job he or she would have occupied during a particular period but for the effects of systemic discrimination. Pettway, supra, at 260, 262. Seldom can more than speculative back pay relief be obtained simultaneously with seniority reform, for despite massive court-ordered competitive advantages and objective criteria-based affirmative action, many aggrieved employees will not immediately achieve their "rightful places," but only a more favorable start on the road toward better jobs. See, e. g., Pettway, supra, 494 F.2d at 249, 258 (back pay normally stops accruing when reformed seniority goes into effect); Johnson v. Goodyear Tire & Rubber Co., 5 Cir. 1974, 491 F.2d 1364, 1375, 1379 (same; individual circumstances vary and not all class members are automatically entitled to back pay); United States v. Georgia Power Co., 5 Cir. 1973, 474 F.2d 906, 927.[32] These substantial, flexible decrees offer much remedial potential in reconciling conflicting demands left by decades of history which cannot be undone. Through the releases as to "continuing effects," the defendants will merely be purchasing for themselves a reasonable opportunity to utilize the decrees in removing any lingering obstacles that impermissibly prevent minority and female employees from reaching the road to their "rightful places." If the defendants leave gaps in their performance of this prospective duty by engaging in practices that reinstitute the discriminatory systems and effects which they have promised to rectify, then most positively they will be subject to suit for such conduct even by employees who signed releases in return for back pay. In this respect the defendants walk a very thin rope. If, however, they meet their responsibilities with consistency, then the law regards each employee's ensuing progress as a matter of his or her personal talent and initiative.
 
 
 77
 Lest we be thought to decide more than is necessary for purposes of this controversy, we simply note that our construction of paragraph 18(g), just advanced, does not wholly comport with the views of either the government, the steel companies, the union, the Harris appellants, or the three female appellants. Nor do those parties' interpretations even among the appellees reflect total consistency. Therefore, it was appropriate that we examine and indicate the meaning of paragraph 18(g), insofar as that meaning can be gathered from the provision's plain language in light of certain limitations which the law imposes upon the defendants' ability to enforce an employee-executed waiver. To be sure, other issues legal and factual will arise as the consent decrees are implemented, notices furnished, back pay accepted, releases executed, and lawsuits filed. It is sufficient for our purposes, however, to observe that ample opportunities will exist in other cases to grapple with those issues under, inter alia, the law of contracts. See generally A. Corbin, Contracts § 1292 (1962). Our present inquiry is confined to the narrower question whether paragraph 18(g) reflects such illegality or impropriety that the district court's approval of the consent settlement should be set aside.
 
 
 78
 Paragraph 18(g) would provide for an unlawful procedure only if it contemplated a release by employees of prospective rights. Such a proscribed device has been characterized by the Supreme Court as "a waiver in advance of a controversy." Wilko v. Swan, 346 U.S. 427, 438, 74 S.Ct. 182, 188, 98 L.Ed. 168, 177 (1953). Cf. Alexander v. Gardner-Denver Co., supra, 415 U.S. at 51, 94 S.Ct. at 1021, 39 L.Ed.2d at 160. Here, all the ingredients of controversy to be compromised under paragraph 18(g) have their operative and legally consequential origin in acts, patterns, and practices which were performed by the defendants up to and including April 12, 1974. Those operative ingredients are thus antecedent to any possible compromise, not prospective. Accordingly, it will be feasible for the Audit and Review Committee, the Implementation Committees, and the EEOC in the case of parties with pending charges, to furnish eligible employees with comprehensive, relevant information about their rights (for example, their putative membership in pending private class actions) before any back pay is delivered and before any releases are signed. Such information is calculated to insure that each electing employee settles knowingly and voluntarily, and with an understanding of the manner and extent to which the decrees remedy his or her grievance.
 
 
 79
 Yet the appellants contend that an intelligent, voluntary compromise of even an unliquidated, antecedent claim is unenforceable against the employee as a matter of law and public policy. They argue that since Congress attached the highest priority to the eradication of employment discrimination, and since Congress established a variety of independent remedies for making whole its victims, then a settlement of a claim in one forum or proceeding cannot be raised by the same defendant in bar to another proceeding for more back pay. They maintain that the employee's voluntary release in settlement of a claim for a disputed and concededly uncertain sum[33] can bar the employee only from obtaining further recoveries in the same forum and under the same nomenclature as appertained to the proceeding which resulted in compromise. Specifically, appellants contend that an employee's release can bar the employee from recovering against these same defendants only in another government "pattern or practice" suit instituted on the same cause of action, as if such were likely to occur.
 
 
 80
 This is a novel and ingenious line of argument. It is calculated to circumvent the dicta in Gardner-Denver, supra, 415 U.S. at 52 & n. 15, 94 S.Ct. at 1021 & n. 15, 39 L.Ed.2d at 160 & n. 15, and to gain maximum possible mileage from the FLSA and related cases led by Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945).[34] We reject the theory.
 
 
 81
 The appellants attempt to obfuscate the issues by mixing several distinct ideas, including election of remedies, prospective waiver, liquidated as opposed to unliquidated damages, and congressional policies underlying different statutes. The most egregious element in this mixture is the appellants' fallacious equation of the principles of election of remedies and release of a cause of action. They correctly cite Gardner-Denver for the propositions that Congress has created parallel and overlapping remedies to combat employment discrimination, that the employee may pursue those remedies in separate forums, and that "an employee's rights under Title VII are not susceptible to prospective waiver." 415 U.S. at 51, 94 S.Ct. at 1021, 39 L.Ed.2d at 160. They fail to recognize, however, that Gardner-Denver does not hold or imply that an aggrieved employee may freely seek additional relief in other forums after he has voluntarily released in one forum his claims arising from the same operative factual complex, for valuable consideration. A full and adequate compensation for a wrong, founded in various remedial measures, is one thing; a succession of compensations, each seeking to be full and adequate, quite another.
 
 
 82
 Gardner-Denver holds only that "an individual does not forfeit his private cause of action if he first pursues his grievance to final arbitration under the nondiscrimination clause of a collective-bargaining agreement." 415 U.S. at 48, 94 S.Ct. at 1020, 39 L.Ed.2d at 158. Eviscerating Dewey v. Reynolds Metals Co., 6 Cir. 1970, 429 F.2d 324, 332, aff'd by equally divided Court, 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971), the Supreme Court explained quite succinctly the basis for its decision. Arbitration is a collective right; a Title VII cause of action is a personal right. When the employee submits a grievance to arbitration, he or she is pursuing a contract right which flows from the collective bargaining agreement. The rights asserted in a Title VII suit flow, by contrast, from an act of Congress independent of the traditional labor-management bargaining process. Most fundamentally, however, the Supreme Court recognized that the congressional policy behind the various Title VII remedies for aggrieved workers (charges, investigations, conciliations, EEOC suits on behalf of charging individuals, and private suits) could be frustrated in unionized industry if those remedies were subject to contractual revision, in a "final and binding" manner, through the majoritarian give-and-take of collective bargaining.[35] Consequently, neither do the rights conferred by Title VII constitute a proper subject of collective bargaining, nor may the employer approach the employee directly in an effort to obtain a prospective waiver "as part of the economic bargain" with the union, or, by extension, with the employee even if there is no union.
 
 
 83
 The appellees rely heavily on certain language in Gardner-Denver, which concededly is dicta. Still Justice Powell's statements appear carefully- considered, and, given the apparent unanimity with which the Justices accepted them, we agree with Judge Pointer that appellees' reliance is well-taken. The Court stated:
 
 
 84
 The actual submission of petitioner's grievance to arbitration in the present case does not alter the situation (that prospective Title VII rights may not be waived). Although presumably an employee may waive his cause of action under Title VII as part of a voluntary settlement, 15 mere resort to the arbitral forum to enforce contractual rights constitutes no such waiver.
 
 Footnote 15 is as follows:
 
 85
 15 In this case petitioner and respondent did not enter into a voluntary settlement expressly conditioned on a waiver of petitioner's cause of action under Title VII. In determining the effectiveness of any such waiver, a court would have to determine at the outset that the employee's consent to the settlement was knowing and voluntary.
 
 
 86
 415 U.S. at 52 & n. 15, 94 S.Ct. at 1021 & n. 15, 39 L.Ed.2d at 160 & n. 15.
 
 
 87
 The appellants attack this language with other nondecisional language found in footnote 14. There the Court suggested that in cases where the employee prevails at arbitration but later seeks judicial relief, courts are capable of adjusting their remedies to prevent duplicative recoveries. The Court added that if the employee obtained relief at arbitration "fully equivalent to that obtainable under Title VII," then there would be no need for a lawsuit or additional relief from the courts.
 
 
 88
 We believe that any apparent conflict is wholly superficial, and that the two statements are easily reconciled by reference to what was at issue in Gardner-Denver, and what was not. In the first place, Gardner-Denver did not involve the volitional release of a cause of action. It did involve the question whether an employee's resort to binding arbitration operates as a binding election of remedies. For reasons mentioned previously the Court answered that question in the negative, and footnote 14 is fully consistent therewith. This consistency is reinforced by the remainder of footnote 15: "In no event can the submission to arbitration of a claim under the nondiscrimination clause of a collective-bargaining agreement constitute a binding waiver with respect to an employee's rights under Title VII." (emphasis added).
 
 
 89
 In no respect does footnote 14, or anything else in Gardner-Denver, support the assertion that an aggrieved employee who freely settles his or her unliquidated demand with the employer or the union may reciprocate by suing the same defendant at a later date on the same cause of action, merely because the employee grows dissatisfied with the payment for which he or she settled. Very frankly, we cannot conceive of how any employment discrimination dispute could ever be resolved outside, or indeed inside, the courtroom, if defendants were forbidden to obtain binding, negotiated settlements. No defendant would ever deliver money, promises, or any other consideration not even a peppercorn except after entry of a contested, final court order, and even this, on appellants' reasoning, might not end the matter. The EEOC and judicial caseloads would swell to chaotic dimensions. Industrial peace would be needlessly threatened. The situation would be greatly inequitable to private parties who, for lack of funds or otherwise, failed to sue on their own and yet also preferred not to take their chances with unpredictable, protracted class actions managed by strangers, a matter over which present practice often leaves them little or no option.[36] In sum, appellants' theory is as unrealistic, unsound, and ultimately rooted in dogmatism as its thoroughly discredited obverse the notion that private nonparties are bound by res judicata or estoppel to the results of government "pattern or practice" suits. Such a doctrine is unheard of. It deprives the employee of the chance to make a choice that previously was not available, even though the opportunity itself does not cost the employee a wink. It is contrary to the policies and procedures that heretofore have been followed in employment discrimination cases.[37] It seemingly has been rejected by this court on a previous occasion, see Rodriguez v. East Texas Motor Freight, supra.[38] We explicitly refuse to recognize it here.
 
 
 90
 There remain the matters of public policy and the alleged insufficiency of the back pay fund. We are aware of no case which has held, or even suggested, that an employee's binding release for valuable consideration of a disputed (in fact and amount) employment discrimination claim violates public policy. Appellants point to no such cases, but rely instead upon two early decisions under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq., Brooklyn Savings Bank v. O'Neil, supra, and D. A. Schulte, Inc. v. Gangi, supra note 34, together with various progeny. Although these decisions established that the right under the FLSA to receive "minimum wages, promptly paid" plus time-and-one-half for overtime was absolutely enforceable upon pain of damages, they are clearly distinguishable from this case and furnish no support to appellants.
 
 
 91
 Neither O'Neil nor Schulte held that employees may not accept compromise payments and waive their claims for further relief in situations where the fact of liability or the amount thereof is disputed. In O'Neil, for example, the Supreme Court expressly limited as the issue before it "whether in the absence of a bona fide dispute between the parties as to liability" an employee could waive the liquidated damages to which the statute entitled him. 324 U.S. at 704, 65 S.Ct. at 900, 89 L.Ed. at 1307. The Court took great care not to decide "what limitation, if any . . . the Act places on the validity of agreements between an employer and employee to settle claims arising under the Act if the settlement is made as a result of a bona fide dispute between the two parties, in consideration of a bona fide compromise and settlement." 324 U.S. at 714, 65 S.Ct. at 905, 89 L.Ed. at 1313.
 
 
 92
 In Schulte the Court held that where the only bona fide dispute concerned whether the employer was covered by the FLSA, the employee was not bound to his or her compromise for less than the statutory liquidated reparation. The Court reasoned very simply that in the absence of any dispute other than mere coverage, an employer covered by the Act should not be able to escape its statutory obligation on the theory that coverage was not altogether clear. Again, however, the Court noted that it was not passing on the quite different question whether a covered employer could enter into a settlement with its employees where a bona fide dispute existed as to liability or amount.[39] Moreover, in Schulte the Court left open the possibility that it might approve consent decrees which compromised the amount of payment even where liability and amount were not seriously disputed: "(W)e think the requirement of pleading the issues and submitting the judgment to judicial scrutiny may differentiate stipulated judgments from compromises by the parties." 328 U.S. at 113 n. 8, 66 S.Ct. at 928 n. 8, 90 L.Ed. at 1118 n. 8.
 
 
 93
 Subsequent to O'Neil and Schulte, the courts of appeals dismissed the argument that those decisions somehow forbade voluntary compromises, executed pursuant to consent judgments, with respect to sums the amount of or liability for which was disputed. See, e. g., Urbino v. Puerto Rico Ry. Light & Power Co., 1 Cir. 1947, 164 F.2d 12 (employees settled for minimum FLSA wage plus overtime but not liquidated damages; release constitutes effective bar to subsequent suit for liquidated damages; "the rule of the Schulte case goes to the verge of the law and this being our view we decline to extend that rule any further"); Bracey v. Luray, 4 Cir. 1947, 161 F.2d 128. See also Bowers v. Remington Rand, Inc., 7 Cir. 1946, 159 F.2d 114, cert. denied, 330 U.S. 843, 67 S.Ct. 1083, 91 L.Ed. 1288 (1947) (employer and employee may settle by agreement question whether sleeping time at jobsite constitutes working time).
 
 
 94
 Nor did the decisions of the Supreme Court on similar questions under other statutes yield any indication that the O'Neil-Schulte strict FLSA approach would be extended. In Callen v. Pennsylvania R.R., 332 U.S. 625, 68 S.Ct. 296, 92 L.Ed. 242 (1948), the Court considered the possible validity of a release under a statute which specifically prohibited any contract for an employer's exemption from liability for injuries to employees. (§ 5, Federal Employers' Liability Act, 45 U.S.C. § 55). The Court ruled that a release could be valid because
 
 
 95
 (i)t is obvious that a release is not a device to exempt from liability but is a means of compromising a claimed liability and to that extent recognizing its possibility. Where controversies exist as to whether there is liability, and if so for how much, Congress has not said that parties may not settle their claims without litigation.
 
 
 96
 332 U.S. at 631, 68 S.Ct. at 298, 92 L.Ed. at 246. The later case of Boyd v. Grand Trunk Western R.R., 338 U.S. 263, 70 S.Ct. 26, 94 L.Ed. 55 (1949), upon which appellants rely, is not to the contrary. There the Court explained that Callen correctly distinguishes "a full compromise enabling the parties to settle their dispute without litigation, which we held did not contravene the Act, from a device (exclusive venue contract) which obstructs the right of the (FELA) plaintiff to secure the maximum recovery if he should elect judicial trial of his cause." 338 U.S. at 266, 70 S.Ct. at 28, 94 L.Ed. at 58. (emphasis added). Cf. also Duncan v. Thompson, 315 U.S. 1, 7, 62 S.Ct. 422, 424, 86 L.Ed. 575, 579 (1942).
 
 
 97
 In Garrett v. Moore-McCormack Co., Inc., 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 (1942), the Court held that benefits conferred upon seamen by the law of admiralty and the Jones Act, 46 U.S.C. § 688, may be released if it is shown by the proponent that the waiver "was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights."[40] In Blanco v. Moran Shipping Co., 5 Cir. 1973, 483 F.2d 63, cert. denied, 416 U.S. 904, 94 S.Ct. 1608, 40 L.Ed.2d 108 (1974), we recently reaffirmed the Garrett formulation as the "classic test" of a valid and binding release.[41]
 
 
 98
 To be sure, the appellants' public policy position is tenable insofar as the O'Neil-Schulte line of cases once stood rather inflexibly for the idea that certain benefits under protective legislation would be sold for a song unless safeguarded by extraordinary measures. Yet it remains that those cases were tied closely to the mandatory terms of particular statutes, the labor conditions that produced those statutes, and what the Court believed was a clearly discernible congressional intent. Since then, courts have declined in most instances to fashion comparable doctrine from whole cloth, the stronger reasoning being that the rubric of "unequal bargaining power" all too often tempts the judiciary to promulgate social values which, at best, intrude upon the legislative sphere, and at worst reflect imprecise apprehensions of economics and desirable public policy. See, e. g., Walling v. Portland Terminal Co., 330 U.S. 148, 155, 67 S.Ct. 639, 643, 91 L.Ed. 809, 814 (1947) (Jackson, J., concurring) ("Interminable litigation, stimulated by a contingent reward to attorneys, is necessitated by the present state of the Court's decisions").
 
 
 99
 Perhaps it was in an effort to mollify Justice Jackson's indignation that Congress enacted the Portal-to-Portal Pay Act in 1947,[42] one provision of which (29 U.S.C. § 253(a)) expressly declared that FLSA claims "may hereafter be compromised in whole or in part, if there exists a bona fide dispute as to the amount payable by the employer to his employee," provided, of course, that the parties utilize an hourly rate equal to the minimum wage. The Act also provided for waivers of liquidated damages, § 253(b), and announced that its effect would be retroactive as to "any compromise or waiver heretofore so made or given." 29 U.S.C. § 253(d). See McCloskey & Co. v. Eckart, 5 Cir. 1947, 164 F.2d 257.
 
 
 100
 So sharply undercut by Congress even in their immediate ambit, O'Neil and Schulte inescapably provide no support to appellants. Nor do the FELA, Truth-in-Lending Act, or other cases briefed by appellants cast the slightest shadow of doubt upon Congress' selection of voluntary conciliation and compliance as the preferred means or means at least as viable as any other for the vindication of Title VII rights. Though the appellants' contentions may possibly have vitality in rare situations where amounts due "may be mathematically calculated by simple arithmetic," e. g., Watkins v. Hudson Coal Co., 3 Cir. 1945, 151 F.2d 311, 314, we agree with Judge Pointer and the appellees that they will seldom apply, if ever, to Title VII seniority cases, which are inevitably attended by "the impossibility of calculating the precise amount of back pay." Pettway, supra, 494 F.2d at 260. Accordingly, we hold that paragraph 18(g) does not violate public policy.
 
 
 101
 Appellants next assert that an average of $500 per eligible employee in immediate, litigation-free back pay is a priori inadequate and that the consent decrees therefore must be vacated. Our limited scope of review neither requires nor permits us to decide this question in a manner which resolves each and every doubt, as if that were possible in any event.[43] Nor may we pick and choose between conflicting factual hypotheses as if we were a jury.[44] We are concerned, instead, with a scale of probabilities: the probable outcome of contested litigation, balanced against its probable costs in time, money, and public resources. Bryan v. Pittsburgh Plate Glass Co., supra, 494 F.2d at 801; Florida Trailer and Equipment Co. v. Deal, supra. Furthermore, we think it appropriate to take account of the injunctive relief provided by the consent decrees. That plenary relief, diligently implemented and monitored according to the terms of the decrees, will greatly shorten the timespan during which "continuing effects" back pay claims might otherwise continue to mount. Cf. Patterson v. Newspaper Deliverers' Union, supra. Correspondingly, it is undeniably in the defendants' interests to promptly implement the reforms, for surely some eligible employees will decline the tender of back pay in the anticipation of accruing and suing for more,[45] which is their right.
 
 
 102
 Viewed from the foregoing perspective, appellants' contention of inadequacy must be rejected. Their argument comes in essentially two parts: first, an allegation that $500 per employee is considerably less than the awards which have been won in comparable contested lawsuits; second, they assert that the offered sums are fatally insufficient because the appellees have not shown those sums to equal "100% of the amount to which each employee would be entitled if the government, or the employee, successfully litigated (each) back pay claim to final judgment."[46]
 
 
 103
 The second argument is clearly without merit in two respects. In the first place, the burden if one is to be assigned is upon the appellants to demonstrate abuse of discretion in Judge Pointer's acceptance of the decrees. More substantially, however, appellants have assumed that virtually every back pay claimant would succeed in court, either in a private suit or on the coattails of a government suit. The experience of the one contested suit which they cite the Fairfield Works case, see footnotes 7 and 28, supra does not support the assumption. Nor may the appellants reasonably assume that the government would sue every defendant at every affected plant and department for back pay in the absence of, or simultaneously with, the private litigation which they seek to pursue. As we discuss, infra, the government labors under no legal obligation to sue any particular party upon any given occasion. In any event, the Fairfield Works case illustrates a variety of other factors mainly considerable delay and expense to all parties which subtract from appellants' preference for litigation over voluntary compliance. That much we may assuredly say without commenting one way or the other about the merits of the back pay issues which are presently on appeal in the Fairfield case.
 
 
 104
 Moreover, to the extent appellants contend that the average claimant's recovery in Fairfield exceeded the average award under the consent decrees, their argument is misleading. They note that around sixty employees recovered $201,000, or an average of $3,350 per successful employee. They do not mention, however, that more than 3,000 other employees were held entitled to no back pay, with the result that the average award per claimant came to around sixty dollars, or $440 less than under the consent decrees. Nor do they mention that the Fairfield awards were based on a 150 percent-of-actual loss theory, the additional fifty percent representing an estimate for unmatured future effects of past discrimination. See 371 F.Supp. at 1060. It is also useful to note that within the three departments in which the sixty (or sixty-one) successful claimants worked, there were some 298 other members of these classes who received no back pay, and that holding was not appealed. Nor were appeals taken from the classwide denials of back pay in the other private actions, which involved about 105 employees. Without saying more about the Fairfield case, we may candidly observe that it is far from clear that any particular employee would be better off if he or she awaited contested litigation in lieu of accepting the back pay provided by the consent decrees.[47] If the decrees were vacated, however, it is clear that litigation-free back pay would be lost to those whose claims were factually weak and, though arguably entitled to some back pay, probably could not otherwise recover. See F.R.Civ.P. 52(a) (findings made by a district judge may not be disturbed unless "clearly erroneous"). In addition, the immediate industry-wide injunctive reforms which benefit 60,000 minority and female steelworkers would likely evaporate, at least until after years of trials and appeals. Absent a much stronger showing than this, it would plainly be irresponsible for us to assume that the vast majority of affected employees would be persuaded by appellants' gratuitous advice, or that such advice is rendered in those employees' best interests. Cf. Air Line Stewards and Stewardesses v. American Airlines, Inc., supra.[48] The consent decrees offer minority and female employees the opportunity to make an informed and voluntary choice over whether the tendered back pay is satisfactory to them. No reason is suggested why we ought not consider them competent to make such a decision. Absent a compelling showing that the average of $500 per employee represents nothing but a mere pittance, we think that sum, together with each eligible employee's free option to reject his or her tender and sue for more, especially in light of the injunctive relief which extends to all, amply satisfies any legal requirements with respect to the size of the back pay fund in this consent decree settlement.
 
 
 105
 C. Alleged Unlawful Abdication of Responsibilities By Agencies of Government
 
 
 106
 Apart from the items just discussed, the appellants level a series of attacks against selected provisions of the consent decrees which relate to the mechanics and procedures of ongoing enforcement. Though their specific targets vary, these attacks share a common theme: the argument that the involved government agencies and the court below have both exceeded their authority and unlawfully abandoned duties and commitments which are assertedly mandatory under the law. Essentially, appellants maintain that the policies of Title VII and Executive Order 11246 either have been or will be nullified by certain allegedly illegal features of the decrees. These include purported enforcement at the whim of violators, interference with the right of individuals to prosecute separate suits, venue deprival with respect to such separate suits, lack of jurisdiction in the court below to approve or enforce the decrees, and, in several subrespects, alleged renunciation of legal obligations by executive agencies. The district court rejected these complaints on the grounds, first, that none demonstrated illegality in the decrees as of entry, and second, that the court's full complement of continuing equity powers will be sufficient to permit adjustment and resolution of future problems within the framework of the decrees as they arise.[49] We agree in each instance.
 
 
 107
 We begin with introductory paragraph C of each decree, which insofar as appellants challenge it provides:
 
 
 108
 If a private individual seeks, in a separate action or proceeding, relief other than back pay which would add to or be inconsistent with the systemic relief incorporated in this Decree, the plaintiffs will undertake to advise the Court or other forum in which such private action or proceeding is brought that such relief in that action or proceeding is unwarranted.
 
 
 109
 Appellants charge that this promise by the government constitutes an unlawful "disestablishment" of Title VII's enforcement structure. Their argument is premised on the assumption that "(t)he limited resources available to (the EEOC) are appropriated solely to support litigation on behalf of minority employees."[50] Perhaps because the assumption would be untenable in application even if it were valid in the abstract, appellants omit to mention the remainder of paragraph C:
 
 
 110
 Provided that, since this Decree provides for review by the Audit and Review Committee with ultimate review by this Court, the plaintiffs may recommend that matters raised in such separate action or proceeding should be submitted to this Court for resolution under the terms of this Decree.
 
 
 111
 At the outset, we should emphasize what paragraph C does not do, contrary to appellants' apparent belief. First, it does not obligate the government to appear in private actions to oppose or seek transfer of claims for back pay in excess of the sums to be tendered under the consent decrees. Thus, if an aggrieved employee chooses to decline the back pay tendered under paragraph 18(g) of Consent Decree I in hope of securing a greater recovery in court, the government is not obligated by paragraph C to oppose that request. Next, paragraph C clearly does not require the government to oppose requests in private actions for additional individual relief, as distinguished from systemic. If a minority or female individual claims that he or she was not hired, or was discharged, or was otherwise discriminated against because of racial, nationality, or sex-based reasons, and if the grievance can be appropriately remedied without revision of the decrees' systemic scheme, then paragraph C does not obligate the government to oppose such relief in the separate action.
 
 
 112
 Moreover, paragraph C does not commit the government to oppose even requests for additional or inconsistent systemic relief on their merits. Through the Audit and Review Committee and the right of each of its parties to take a given matter before the court, the consent decrees contain an internal mechanism for generating additional systemic remedies when and if they are needed.[51] The parties also recognize that the government, under paragraph C, can do no more than suggest its position to the court in which a separate action for systemic relief is brought.[52] The government cannot bind private parties and it cannot bind any court. If a court concludes that the decrees fail to provide adequate relief for a particular complaint, then it has its usual power to proceed with the action. Paragraph C simply implements the parties' agreement that, in view of the self-correcting features of the decrees, the existence of the power to issue further injunctions does not necessarily mean that its exercise would be wise in every case. As a purely legal matter, however, the only effect that the government's performance of its paragraph C promise can consistently be expected to produce is assurance that judges hearing private actions will be advised of the decrees, their internal adaptability, and the parties' view that changes should be accomplished thereunder in lieu of duplicative or conflicting injunctions. Cf. Dickerson v. United States Steel Corp., E.D.Pa.1974, 64 F.R.D. 351. The district court for the Northern District of Alabama stands prepared, for a period of at least four more years, to undertake "liaison and coordination" with other forums.[53] On the other hand, a forum court will be fully at liberty to treat the government's advice in a particular case with the same hospitality by which we received the appellants' advice concerning the size of the back pay fund.[54]
 
 
 113
 That, in summary, is what the parties bargained for. To us it represents nothing unlawful or improper; indeed, the government in all likelihood could file similar advice with forum courts even if there were no consent decrees.[55] As Judge Pointer incisively noted in terms of the policies and interests at stake, it would not be sound to assume that the government may not oppose relief sought by a private litigant.
 
 
 114
 (F)or example, if a particular black plaintiff, due to his own situation, were to seek an occupational seniority rule considered by the EEOC to be generally adverse to the interests of other black employees, it could hardly be asserted that the EEOC is bound to advocate such relief.
 
 
 115
 63 F.R.D. at 5 n. 4. And in any case, we may not reasonably assume that the administration of paragraph C will produce improper consequences such as venue deprival. Such a problem is not now before us in the form of an actual controversy.
 
 
 116
 Appellants further contend that the consent decrees illegally restrict the EEOC's power to sue under § 706 of Title VII. Proceeding from their assumption, noted earlier,[56] appellants argue that the res judicata effect of paragraph C unlawfully denies minority and female employees a statutory "right" to representation by the Commission in lawsuits to redress each employee's charge of discrimination for which there may be "reasonable cause."
 
 
 117
 We think the appellants are again incorrect, for we are convinced that the EEOC has no such obligation, statutory or otherwise. Title VII vests in each private aggrieved party the right to bring a prompt civil action in federal court, if the Commission has not already filed suit in the individual's behalf or conciliated a settlement which the grievant has accepted as satisfactory. Congress gave the EEOC broad discretion to determine which suits it will bring under § 706 (and § 707), and which it will leave to be brought by private parties. Section 706(f)(1) expressly states that if the Commission has been unable to negotiate a conciliation agreement acceptable to it, then it "may bring a civil action. . . ." (emphasis added). Section 707, relating to "pattern or practice" suits which presumably even appellants would agree are not mandatory upon any particular occasion, uses precisely the same permissive language. Nor is Title VII's legislative history helpful to appellants on this point. In its enactment of the 1972 amendments, Congress gave no positive indication that it intended to require the EEOC to sue anybody, except as the agency thought it advisable in the exercise of sound discretion. The appellants point to no authoritative legislative history or any case law to the contrary.[57]
 
 
 118
 The EEOC's decision not to select individual charges against the steel companies and the union for suit by the agency under § 706 was a reasonable exercise of discretion, particularly since the most serious and pervasive of those charges were properly within the scope of a "pattern or practice" complaint. The backlog of charges is such that the Commission must choose its cases for maximum impact.[58] Given the enormous gains achieved through the consent decrees, it surely was not arbitrary or capricious for the EEOC to decide that it would channel its limited resources to suits in other industries.
 
 
 119
 We conclude, therefore, that no individual has a "right" to prosecution of his or her case by the EEOC upon any given occasion. In the present case the agency has obtained major systemic relief for minorities and females through voluntary compliance. Because any employee who remains dissatisfied with that relief retains his or her private right of action, the appellants miss the point when they assert that the EEOC has "surrendered private rights," and that it has "traded off" the rights of some employees in return for benefits to others. Paragraph C constitutes neither of those horribles, but merely an exercise by the agency of its discretion to decide what actions it will leave to private enforcement.
 
 
 120
 Making substantially the same arguments which they advanced against paragraph C, appellants now shift their attack to paragraph 19 of Consent Decree I, which states:
 
 
 121
 (a) Promptly following the date of entry of this Decree, plaintiff (EEOC) shall review every charge pending against any defendant. Such review shall identify all such charges alleging unlawful employment practices wholly within the scope of this Decree. Within 60 days after completion of such review, EEOC shall advise the charging party in each case so identified that, in view of the relief provided under this Decree, EEOC finds the practice complained of has been resolved by this Decree and recommends to each such charging party entitled to back pay under this Decree that he accept such relief and execute the release.
 
 
 122
 (b) With respect to all pending charges which allege unlawful employment practices not wholly within the scope of this Decree, EEOC shall conduct an expedited investigation of such charges and attempt to resolve each such charge in a manner consistent with the principles set forth in Title VII and this Decree. * * *
 
 
 123
 Again emphasizing the first half of the government's undertaking but omitting to deal with the second, appellants assert that the EEOC has unlawfully relinquished its statutory duty to conciliate charges of discrimination for which "reasonable cause" exists. See § 706(b) of Title VII, 42 U.S.C. § 2000e-5(b). This would be a serious complaint if it had a firmer foundation, for § 706(b) does say that the Commission "shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion." (emphasis added). Although we have held that "an effort to conciliate by the EEOC is not in any sense a condition precedent to the charging party's right to seek judicial consideration of his grievance,"[59] that rule follows from the fact that the aggrieved individual is not responsible for the actions and inactions of the agency. We have never held, or even suggested, that the EEOC is excused from its statutory duty to conciliate when it seeks the assistance of the courts in order to enforce the mandates of Title VII on behalf of specific aggrieved parties, pursuant to § 706. The reported cases on the point are to the contrary. See, e. g., EEOC v. Western Elec. Co., D.Md.1974, 382 F.Supp. 787, 796; EEOC v. Container Corp., M.D.Fla.1972, 352 F.Supp. 262, 265. One court has even indicated that the Commission may have similar responsibilities in connection with "pattern or practice" suits brought under § 707 subsequent to the effective date of the 1972 amendments. United States v. Masonry Contractors Assn., 6 Cir. 1974, 497 F.2d 871, 875-76 (dicta). Cf. § 707(e) of Title VII, 42 U.S.C. § 2000e-6(e). This is such a lawsuit.
 
 
 124
 We have determined, however, that this case does not require us to attempt to settle these intricate questions in terms of congressional intent with respect to jurisdiction. For one thing, the appellants do not couch this portion of their argument in those terms. For another, any duty to conciliate as a matter of the EEOC's power to sue was fully satisfied during the six months of negotiations which led to the consent decrees. Appellants equate "conciliation" with give-and-take bargaining; nowhere do they assert that the decrees are not clearly the products of give-and-take bargaining. Nor do they advance any sort of attack directly against paragraph 19(b), which plainly does contemplate that the Commission will attempt to conciliate those charges which are "not wholly within the scope" of the decrees.
 
 
 125
 Thus, we are left very narrowly with a contention that paragraph 19(a) illegally obligates the EEOC to drop all efforts to conciliate certain charges which were pending at the time of decree entry: namely, those which allege "unlawful employment practices wholly within the scope" of the decrees. The resolution of this issue is not difficult; it follows from a careful consideration of the descriptive terminology "wholly within the scope." For once, the two sides in this dispute are fundamentally close together on the correct result. Appellants suggest that in cases where the Commission concludes that the decrees will in fact resolve an employee's problems, it should so advise the employee. They add that where the Commission thinks an employee needs additional or inconsistent relief, it should seek to conciliate an agreement on that basis.[60]
 
 
 126
 Subject to one area of qualification, which we think is well taken, the appellees agree. Accordingly, we construe paragraph 19 to mean that a charge is "wholly within the scope of the Decree" if the decree both encompasses the nature of the charged discrimination and contains a remedy which the EEOC deems adequate and appropriate for the particular grievance. Unless the Commission is satisfied that each of these conditions is met, then it has not only the right but also the duty to conciliate the charge separately under subparagraph (b) in lieu of advising the grievant to settle or accept an immediate right-to-sue letter.[61]
 
 
 127
 Nevertheless, it is important to stress that the question whether a given charge lies "wholly within the scope" of the decrees is ultimately a matter committed to the sound judgment of the EEOC, although we do not suggest that the agency's exercise of judgment would be entirely unreviewable in every conceivable circumstance. Yet appellants seem to believe that the agency is duty-bound to seek precisely the relief desired by every charging party. That is not so. The EEOC does not stand in a lawyer-client posture vis-a-vis the persons who are protected by Title VII.[62] Rather, the Commission must endeavor to eliminate discrimination in a manner consistent with the public interest. Cf. Bryan v. Pittsburgh Plate Glass Co., supra, 494 F.2d at 803. That responsibility attaches to conciliations as well as to lawsuits. Obviously, any charging party who feels that the relief under the decrees is inadequate has a statutory right, upon receipt of his or her notice from the EEOC, to institute a private action seeking additional or inconsistent relief. As we explained earlier, the EEOC's failure to obtain through conciliation the particular relief sought will in no way bar the private party's suit.[63] In conclusion, we find no merit to appellants' complaints about the conciliation procedure established by paragraph 19.
 
 
 128
 The final installment in this series of objections concerns the relationship of paragraph C of each decree and paragraph 16 of Consent Decree I to the functions of the Secretary of Labor and the Office of Federal Contract Compliance under Executive Order 11246. Insofar as is presently material, paragraph C of each decree provides that, as to all plaintiffs including the Secretary, the decrees are res judicata and resolve all issues of employment discrimination to which the decrees are directed. Paragraph 16 of Consent Decree I adds that
 
 
 129
 So long as the defendants are in compliance with the provisions of this Decree and of Consent Decree II entered this date, the Secretary of Labor and the Office of Federal Contract Compliance shall rely upon the continuing audit of that compliance by Government representatives to the Implementation Committees and by the Government member of the Audit and Review Committee as adequate for purposes of all compliance reviews under Executive Order 11246, as amended, at the plants and facilities listed in paragraphs 3(c) and (d).
 
 
 130
 Appellants broadly assert that these provisions are unlawfully calculated to relieve the companies of their duty to comply with the Executive Order, and moreover to dispense with the OFCC's responsibility to police government contractors' efforts to achieve and maintain compliance. Appellants suggest that paragraph 16 has or will have several purported illegal effects: abolition or dilution of compliance reviews; lax reporting and review of mandatory affirmative action plans; failure by the government to cancel or refuse to award contracts due to noncompliance with the Executive Order; compliance audits by violators; violation by the OFCC of its own regulations concerning enforcement hearings; and lack of jurisdiction in the district court.
 
 
 131
 These contentions are meritless, singly and collectively. Paragraph 16 neither states nor implies that the companies are excused from compliance with Executive Order 11246. In fact they are not. Paragraph 16 merely designates the government representatives to the Implementation Committees and the government member of the Audit and Review Committee as compliance officers for the purposes of compliance reviews. Such designation is specifically authorized by § 401 of Executive Order 11246.[64]
 
 
 132
 Under paragraph 16 of Consent Decree I, the OFCC will rely on the government's continuing audit of the companies as adequate for purposes of the Executive Order, as long as they remain in compliance with the decrees. If the government concludes that the companies have violated the decrees, then not only may it seek judicial enforcement on behalf of the Secretary,[65] but also the OFCC is in no respect inhibited by the decrees from invoking all sanctions available to it including contract cancellation[66] and refusal to enter further contracts.[67] Nor do the decrees purport to affect any of the Secretary's other enforcement alternatives set forth in subparts C and D of Executive Order 11246.
 
 
 133
 Substantively, the decrees are replete with indications of how compliance with the decrees is tied directly to compliance with the Executive Order. Paragraph 3(b) of the Agreement incorporated into Consent Decree II requires an affirmative action plan approved by the OFCC pursuant to the Order;[68] paragraph 3(c) provides for annual OFCC review of goals and timetables established by that plan in order "to determine if they should be adjusted and in order to monitor the companies' efforts to meet and comply with such goals and timetables." In addition to this general obligation to submit affirmative action plans for approval, paragraph 10 of Consent Decree I specifically requires the companies to implement affirmative action programs for trade and craft jobs in accordance with "Revised Order No. 4."[69] Similarly, paragraph 3(a) of Consent Decree II's Agreement provides for OFCC approval of all goals and timetables relating to the hiring of minorities and females where underutilized. Paragraph 11 of Consent Decree I orders the companies not to use tests or other selection procedures for hiring, assignments, or promotions unless such procedures have no disparate impact on minorities and females or unless they have been validated in accordance with the Secretary of Labor's regulations.[70] Finally, paragraph 15 of Consent Decree I and Audit and Review Committee Directive No. 1, discussed infra, make available to the government representatives, and in turn the OFCC, all information that it could obtain or would require under the Executive Order. All parties to the decrees stipulate that any further material needed may be obtained by the government member of the Audit and Review Committee.
 
 
 134
 Under these circumstances, we fail to see how the appellants can seriously argue that the consent decrees have diminished either the companies' obligation to comply or the Secretary's duty (or ability) to enforce.[71] True, the OFCC provisions are novel, but that alone does not render them unlawful. We know of no policy in the law which encourages duplication of bureaucratic efforts and expenditures in the absence of a showing that some tangible public benefit will accrue. Appellants have made no such showing here, nor have they attempted to deal with the fact that Congress has turned its face against such duplication. As one of the 1972 amendments to Title VII, Congress enacted § 715, 42 U.S.C. § 2000e-14. That section established an Equal Employment Opportunity Coordinating Council, composed of the Secretary of Labor, the Attorney General, and the Chairpersons of the EEOC, the Civil Service Commission, and the Civil Rights Commission. Congress specifically gave the Council "the responsibility for developing and implementing agreements, policies and practices designed to maximize effort, promote efficiency, and eliminate conflict, competition, duplication and inconsistency among the . . . branches of the Federal Government responsible for the implementation and enforcement of equal employment opportunity legislation, orders, and policies." We agree with the appellees that the Secretary of Labor's role as a participant in negotiating the decrees, and in sharing his authority with the other government agencies, directly implements the congressional mandate in § 715 and comports fully with the aim of Executive Order 11246 which is to assure that bidders for government contracts do not discriminate.
 
 
 135
 In conclusion, the appellants' contention regarding the jurisdiction of the district court is frivolous and due to be rejected.[72] As for any potential violations by the Secretary of Labor or the OFCC of Executive Order 11246 or the regulations promulgated thereunder, no ripe, justiciable controversy is presented for our consideration. We have no reason to suspect that the appropriate offices will not conduct such hearings and allow such participation (see, e. g., 41 C.F.R. § 60-1.26(b)) as the Constitution and laws may require when and if disciplinary action against the steel companies becomes necessary.
 
 D. Adequacy of Judicial Supervision
 
 136
 This aspect of the appeal raises the question whether the district court abused its discretion by entering the consent decrees without simultaneously ordering the periodic preparation and submission of detailed progress reports independent of the information to be generated under the decrees. The appellants concede, at least arguendo, that the court has unlimited supervisory powers pursuant to its retained jurisdiction, but they ask us to presume that it will lack sufficient information upon which to properly assess the decrees' viability in practice.
 
 
 137
 Reference to the law and the record demonstrates that appellants' fears are overwhelmingly speculative and inconsequential as a ground for vacating the decrees. It appears to us that their complaint originates from a basic misconception of the nature of the parties' agreement. The Supreme Court has explained that:
 
 
 138
 Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it. Because the defendant has, by the decree, waived his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation.
 
 
 139
 In a large number of cases which have gone to contested judgments under Title VII[73] and in other areas of civil rights[74] the courts have included comprehensive reporting requirements in their decrees. Defendants who were found guilty of discrimination have been ordered to report directly to the court so that the federal judge might monitor their corrective efforts. Such reporting is designed to assist the court in implementing its decree by identifying problems for which additional or clarifying orders may be necessary. In this case, by virtue of bargaining skill or whatever, the defendants successfully pretermitted contested litigation and at least for the time being the management of employment relations in the steel industry by direct federal injunction. Not illogically, the consent decrees contain no directive requiring the defendants to report to the court at established intervals. Instead, the defendants have assumed the obligation, inter alia, to furnish certain information to the Audit and Review Committee on a regular basis and to the government upon request, thereby subjecting themselves to the court's contempt power for recalcitrance. Similarly, no one disputes that the court can require production of any information that it might desire in aid of its continuing jurisdiction. Yet it ought not be overlooked that the parties shared a paramount purpose in settling this matter as they did: that is, while the court is vested with final authority to see that the decrees are carried out in conformity with the law, the parties have expressed a preference for a scheme which contemplates ongoing voluntary compliance in an unusual day-to-day atmosphere of self-government. In the absence of a contested judicial resolution of the issues raised by the government's complaint, we are obliged to respect that purpose. United States v. Armour & Co., supra.
 
 
 140
 Consequently, we deem as the sole issue presently before us whether the mechanics of information compilation and production established by the decrees are fundamentally sufficient and serviceable to assist, rather than subvert, the district court's role. The appellants would have the steel companies file detailed periodic reports concerning a number of items: (1) all promotions, including identities of bidding employees and the races of successful bidders; (2) identities and ethnic information regarding all "helpers" who qualified for apprenticeship training; (3) similar information as to all employees who received such training; (4) identities and races of all persons hired for clerical and technical jobs; (5) names and races of all persons enrolled in management training programs; (6) names and races of all persons appointed to supervisory positions; (7) names and ethnic information about employees affected by force reductions; and (8) "detailed information" about retained wage rates among LOP transferees. They flatly assert that "(n)one of this information will be provided to the District Court under the Consent Decrees."[75]
 
 
 141
 We think the appellants are clearly wrong. In the first place, paragraph 15 of Consent Decree I and paragraph 5 of Decree II's Agreement expressly obligate the companies to maintain complete records on virtually every item listed by the appellants, plus information as to sex. Under paragraph 15(b), the government (on its own motion or at the court's instance) need only ask for these records in order to obtain them. Moreover, appellants seemingly have ignored certain key provisions of Directive No. 1 of the Audit and Review Committee, dated May 31, 1974, which is in the record and copies of which were furnished to appellants on June 3, 1974. There the Audit and Review Committee ordered that its staff[76] "shall keep written records of all actions taken in performance of the Committee's duties under Consent Decrees I and II." Such records are to be prepared by company officials, verified by the government, the union, and the companies for accuracy, and furthermore "(c) opies of such written records shall be made available to all members of the Committee and to the United States District Court for the Northern District of Alabama . . . for its review." (emphasis added). Directive No. 1 also provides that every implementation Committee must keep written records "of all actions taken in performance" of its duties, and that copies thereof shall be made available to the court. It goes without saying that the duties of the Implementation Committees and the Audit and Review Committee include, above all else, monitoring the progress of the companies and the union under every paragraph of each consent decree. The progress of the companies and the union, in turn, can be measured by nothing other than the progress of minority and female steelworkers in all phases of employment. Complete reports on that progress will be "made available," i. e., delivered, to the district court "for its review." Directive No. 1 can have no other reasonable meaning, and appellants' argument to the contrary that it means the court will never see anything but the minutes of committee meetings is unreasonable and unacceptable.
 
 
 142
 In a last-ditch effort, appellants imply that Directive No. 1 is but a mere subterfuge that the parties to the decrees did not sincerely mean what they said. Appellants ask us to presume that the Audit and Review Committee will repeal Directive No. 1, perhaps next week, maybe next month, in an effort to conceal information from the district court. We need only mention that the record contains absolutely no evidence to that effect, and hence we respectfully decline to indulge in that presumption. The district court possesses plenary authority to deal with such contingencies as they may arise. The appellants' claim of inadequate judicial supervision is purely and simply without merit.
 
 E. Lack of Prior Notice
 
 143
 The final contention raised by all appellants is that the decrees should be invalidated on the ground that interested private parties and their counsel were not invited to participate in pre-decree negotiations, nor were they given advance formal notice and opportunity to intervene prior to entry of the decrees by the district court. To eliminate much confusion at the outset, we repeat that we are concerned with a consent judgment between agencies of the federal government, nine steel companies, and a union. This judgment, in the form of an industry-wide settlement of disputes relating to employment discrimination, was reached after months of conciliations among the parties and the filing of an undisputedly proper § 707 "pattern or practice" complaint by the government. To the extent appellants believe that the absence of prior notice and opportunity to intervene abridged an unconditional right of intervention, that belief should be dispelled by part II of our opinion, supra.
 
 
 144
 Moreover, we know of nothing in § 707 or in any other statute, order, or regulation which suggests that the parties must permit private individuals to participate in their conferences before the government may finalize a "pattern or practice" consent decree. Cf. Hadnott v. Laird, 1972, 149 U.S.App.D.C. 358, 463 F.2d 304, 308. For reasons explained heretofore, private rights do not rise and fall on the outcome obtained by the government. "In short, the Government's right and duty to seek an injunction to protect the public interest exist without regard to any private suit or decree." United States v. Borden Co., 347 U.S. 514, 519, 74 S.Ct. 703, 706, 98 L.Ed. 903 (1954). As a matter of policy, we think it highly doubtful that participation in "pattern or practice" conciliations by everyone who so desired would serve either the public interest or the interests of minority and female employees.[77] The remarkable feature of the present decrees is that so many self-interested parties were able to leave so few unresolved remedial issues. The major concessions yielded by the defendants could have been obtained only by all parties to the negotiations working together unselfishly toward a settlement keyed to broader public goals. If a multitude of intervenors and representatives of private individuals with conflicting personal interests had participated in the framing of the decrees, then probably no comparable industry-wide agreement could have been reached.
 
 
 145
 The appellants' demand for notice and hearing prior to judicial approval of the consent decrees is not well taken. Assuming arguendo that the 1972 amendments to Title VII did not affect the capacity of private persons to maintain a "pattern or practice"-type cause of action,[78] we do not think that appellants were indispensable parties.[79] No bona fide contention is made that appellants' joinder was essential to fashioning a complete, final, and enforceable judgment as between the government and the defendants. See Advisory Committee Note, 1966 Amendments to F.R.Civ.P. 19. Furthermore, as we have reiterated throughout, every appellant and every employee whom appellants purport to represent retains his or her private right of action in its entirety.[80] Obviously, the nonjoinder of appellants and all other minority and female steelworkers subjects each defendant to "a substantial risk of incurring double, multiple, or otherwise inconsistent obligations." Quite arguably, however, that is a risk Congress intended to impose. Without a doubt it is one which the defendants are willing to incur. In any case, the appellants have neither identified all of the persons whom they would have the court join as plaintiffs, nor did they present any evidence concerning the physical feasibility of such joinder. We conclude that the district court did not abuse any principles of "equity and good conscience" in proceeding as it did, especially in view of the drastic and disfavored remedy of dismissal which is dictated by Rule 19 where indispensability is inescapable. Cf. United States v. Masonry Contractors Assn., supra, 497 F.2d at 875. Note also that the district court took special care in the "shaping of relief," F.R.Civ.P. 19(b), to avoid prejudice with respect to future intervention, even by persons who already had been allowed to intervene, in the event additional questions arise concerning the decrees in operation. 63 F.R.D. at 4 n. 2, 5. This procedure may well prove to be more useful over the life of the decrees than would a single opportunity for a contest preceded by formal notice to all interested individuals, assuming such notice were physically and fiscally possible.
 
 
 146
 Actually, any further consideration of appellants' theory in terms of joinder of parties becomes hopelessly distorted and unproductive. It appears to us though again the argument is utterly vague and conclusory[81] that their real objective is to convert what began as a government "pattern or practice" suit into an eventual F.R.Civ.P. 23 class action. Under Rule 23(a) one or more members of a class may initiate a class action when, inter alia, "(1) the class is so numerous that joinder of all members is impracticable . . . ." (emphasis added). This criterion is consistent with the scope in which appellants purport to prosecute these appeals: "Appellants intervened for the express purpose of assuring that all aggrieved employees, to the extent practicable, were given adequate notice and an opportunity to be heard prior to final approval of the Decrees;"[82] and: "National Organization for Women, Inc., Present and Former Female Employees of Defendant Companies."[83]
 
 
 147
 We need not delve into a labyrinthian search for the answer to whether the district court somehow erred in failing to certify the proceedings below as a class action before finally entering the decrees, for no one has briefed or argued the point in exactly those terms. Yet we find both ironic[84] and puzzling the apparent assumption that class action treatment necessarily would have yielded the results sought by appellants. In the context of Title VII and employment discrimination generally, such actions today are conducted typically pursuant to F.R.Civ.P. 23(b)(2), which presupposes allegations that the defendant has acted or refused to act in a manner hostile to the group, thus making declaratory or injunctive relief appropriate in favor of the entire class, if warranted by the evidence.[85] The (b)(2) class is by definition a cohesive aggregate, and hence its members are said to be bound by a "superior" res judicata effect. See Wetzel v. Liberty Mutual Ins. Co., 3 Cir. 1975, 508 F.2d 239, cert. denied --- U.S. ---, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); LaChapelle v. Owens-Illinois, Inc., 5 Cir. 1975, 513 F.2d 286, 288 n. 7 ((b)(2) members may not "opt out"); 3B. J. Moore's Federal Practice P 23.31(1), at 23-526-27 (1974). Thus, unlike the 23(b)(3) "common question" class action (most frequently utilized in suits for money damages), as to which Rule 23(c)(2) requires individual notice to the fullest practicable extent, Rule 23 contains no specific notice requirement for (b)(2) actions.[86]
 
 
 148
 Even so, in connection with awards of classwide back pay we have suggested that some form of notice should be distributed in order to overcome "the problem of binding unidentified class members." Pettway, supra, 494 F.2d at 257. But experience teaches that such notice may come late in the litigation. Id. Moreover, in view of Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177 n. 14, 94 S.Ct. 2140, 2152 n. 14, 40 L.Ed.2d 732, 748 n. 14 (1974), and Sosna v. Iowa, 419 U.S. 393, 396 n. 4, 95 S.Ct. 553, 556 n. 4, 42 L.Ed.2d 532, 539 n. 4 (1975), we must approach skeptically the notion that such notice must issue at all at least at the expense of someone other than a volunteer in class actions other than (b)(3) actions. In Eisen the Supreme Court carefully laid aside the dual problem of what notice, if any, might someday be necessary in favor of a (b)(1) or (b)(2) class's absent members, and who would be responsible for the expense. In Sosna, however, the Court indicated quite plainly that since the suit sought injunctive and declaratory relief, but not monetary relief, "the problems associated with a Rule 23(b)(3) class action, which were considered by this Court last Term in (Eisen )," did not exist. Id. Thus, speaking conservatively, it is by no means clear that advance notice to all affected individuals would have followed had the district court permitted appellants to litigate the merits of the consent decrees in a procedurally less-onerous form of Rule 23 class action. Of course, after Eisen, we do not suppose that appellants would have wished to proceed pursuant to Rule 23(b)(3), although we intimate no opinion concerning the nature of relief, if any, which may require a (b)(1) or (b)(2) action to accommodate the notice prescription applicable to class actions under (b)(3). We simply note, by way of summary, that appellants apparently seek to reach a particular destination advance notice to all aggrieved steelworkers by a rather dubious and, perhaps, prohibitively expensive route.
 
 
 149
 Nevertheless, some private parties were allowed to intervene and attack the decrees' legality subsequent to their entry. Certainly that factor alone did not moot the complaints about the absence of prior notice, but we have determined that those complaints lack merit. With respect to the party scope of the subsequent intervention, only NOW complains, and we have already rejected NOW's contentions. The dispute over participation by aggrieved employees thus reduces to the settled principle "that intervention will not be allowed for the purpose of impeaching a decree already made." United States v. California Coop. Canneries, 279 U.S. 553, 556, 49 S.Ct. 423, 424, 73 L.Ed. 838, 841 (1929). Naturally the rule is not inflexible, and we think the district court acted wisely in allowing the intervention that took place. See Shapiro, Some Thoughts on Intervention Before Courts, Agencies, and Arbitrators, 81 Harv.L.Rev. 721 (1968). Yet the court clearly was entitled to limit the issues as it did, and to deny vacation of the decrees absent a convincing showing that they operated to violate substantial rights of the intervenors. See generally 3B. J. Moore's Federal Practice PP 24.16(1), 24.16(5), at 24-595-96, 24-651-52 (1974). They do not, and that decides this point.
 
 IV. RELIEF FOR WOMEN
 
 150
 On behalf of the three female appellants whom it was permitted to appoint as intervenors, NOW complains of certain alleged deficiencies in the items of relief afforded women under the consent decrees. These objections go squarely to the adequacy-in-fact of the decrees' remedial provisions, and therefore our limited scope of review precludes substitution of our judgment for that of the parties. We find none of these alleged shortcomings fatal to the decrees' legality, nor did their possible existence render Judge Pointer's approval of the decrees an abuse of discretion. We briefly discuss these objections.
 
 
 151
 First, NOW claims that the nation's female workforce is severely underrepresented in the steel industry. Conceding at least "tokenism" by the steel companies in the hiring of women since Title VII took effect on July 2, 1965, NOW nevertheless contends that gross underrepresentation persists mainly in production and maintenance jobs and in trades and crafts because many more women would be engaged in such occupations today but for alleged wholesale discharges and bans on new female hires in the post-war 1940's. NOW thus asserts that today's shortage of females in traditionally "male" jobs is a "present effect" of 1940's sex discrimination; that each of its victims should be identified and immediately hired or reinstated with full constructive seniority and back pay from two years prior to the filing of the first such charge; and that the consent decrees are defective as a matter of law because they do not provide this relief.
 
 
 152
 We may assume that NOW is correct on all the facts and most of the law, but the consent decrees stand. Assuming, for example, that massive discrimination in the 1940's survived the effective date of Title VII, that constructive seniority could properly be awarded, and that its recipients could show themselves entitled to some amount of back pay, the hurdles of limitations and laches are by now virtually insurmountable, as NOW admitted in the district court. Under these circumstnaces the decrees clearly are not fatally deficient for want of relief to women who were discharged or refused employment thirty years ago. In the event any woman feels she can sustain such a claim, the decrees plainly do not affect her ability to pursue it in a private suit.
 
 
 153
 Next, NOW attacks paragraph 10(a) of Consent Decree I, which provides that affirmative goals for female promotion into trades and crafts shall be based on the percentage of females in production and maintenance jobs. Proceeding once more from the alleged historic exclusion of women from both types of jobs, NOW maintains that paragraph 10(a) "makes a mockery" out of any obligation on the companies' part to promote females into trades and crafts.
 
 
 154
 NOW has simply overlooked paragraph 2(a)(1) of the Agreement incorporated into Consent Decree II. That paragraph establishes as an interim goal, subject to annual review, that twenty percent of all new hires in production and maintenance shall be female. That goal, together with mandatory utilization analyses, is likewise to be submitted to the OFCC for approval pursuant to Executive Order 11246.[87] Trade and craft jobs are among the more desirable and difficult in the plant. It is no surprise that the parties would create priorities in filling those jobs for persons already employed in the plant and thus familiar with its operations. Because the present number of women occupying production and maintenance jobs is small, NOW is correct in that the initial effect of the decrees is to set a relatively small numerical goal for females in trades and crafts. That condition, however, should be cured rather quickly as more women are hired into production and maintenance units and goals are periodically recomputed on the basis of plant population. As the percentage representation of women in production and maintenance grows by virtue of Decree II's hiring requirement, the numerical rate for female advancement to trades and crafts should rise correspondingly. And again, any woman who dislikes the goals established by the decrees retains her right to seek additional or inconsistent relief in court without forfeiting whatever benefits the decrees confer upon her.
 
 
 155
 NOW's final exclusively-feminist contention is a challenge to the decrees' failure to provide seniority carryover and rate retention for women who may seek to transfer from a technical, clerical, or plant security job into production and maintenance. NOW asserts that such relief is mandated by Bing v. Roadway Express, Inc., supra, where we held that a black "city" driver who had been discriminatorily excluded from a higher-paying "road" position was entitled to "road" seniority from the date at which he would have transferred, based on his qualifications, but for racial discrimination. We believe NOW places far too general a reliance on Bing. Truck driving is essentially truck driving, though firms sometimes require more experience for "road" positions. By contrast, secretarial work and rail straightening are, at least in obvious respects, quite different. At any rate, the female appellants did not introduce any evidence into the record which might enable a court to develop this point in greater detail. Accordingly, we assume from our common experience that clerical-technical-plant security and production-maintenance are basically unrelated occupations. Of course, even if we are incorrect, and we know there are some similar jobs e. g., production record-keeping, the present state of affairs is not irrevocable; the progress under each decree is subject to continuing review and modification as circumstances justify. Likewise, any woman who considers herself aggrieved may file a charge and/or a lawsuit. The decrees themselves are not made unlawful simply because they presently fail to deal with every conceivable allegation of discrimination in the steel industry. In conclusion, NOW's claims on behalf of the three female appellants are without merit; NOW's misunderstanding of eligibility for back pay is easily resolved by a careful reading of paragraph 18(c) of Decree I; all other contentions are considered and rejected.
 
 V. CONCLUSION
 
 156
 We would be remiss if we failed to mention the decision of the Supreme Court in Albemarle Paper Co. v. Moody, --- U.S. ---, 95 S.Ct. 2362, 44 L.Ed.2d ---, which was handed down on June 25, 1975, as we neared completion of our work in this case. We have reviewed Moody carefully indeed with great particularity its repeated emphasis that one of Title VII's paramount purposes is "to make persons whole for injuries suffered on account of unlawful employment discrimination." At p. ---, 95 S.Ct. at p. 2372. This emphasis is entirely consistent with the opinions from our circuit which we have cited or discussed herein. Furthermore, we are fully mindful that Moody reaffirms as " '(t)he general rule . . . that when a wrong has been done, and the law gives a remedy, the compensation shall be equal to the injury.' " Id. at ---, 95 S.Ct. at p. 2372, quoting Wicker v. Hoppock, 73 U.S. 94, at 99, 6 Wall. 94, at 99, 18 L.Ed. 752.
 
 
 157
 Yet Moody does not affect our thinking about this case. The critical portion of the Court's rejection of "good faith" as a general defense to liability for back pay a rejection already accomplished in a number of our decisions begins on page 14 of the opinion, viz: "It follows that, given a finding of unlawful discrimination. . . ." (emphasis added). We may reasonably assume that the Court chose its words cautiously, for shortly thereafter it discussed in some detail the meaning of "clearly erroneous" in the context of other issues presented by Moody. Here, of course, we have no judicial finding of unlawful employment discrimination, only two consent decrees. To our knowledge they are governed by rules of law substantially less rigorous than those which govern contested litigation. Correspondingly, the scope of our appellate review is narrower, though no less deliberate. In sum, we adhere to our conclusions that these consent decrees are consistent with the public interest, that they represent a sound and reasonable exercise of the discretion possessed by the executive agencies, and that they implement the policies of Title VII and related laws to an exceptionally thorough degree. Unless settlement is to be held unlawful, we do not think the decrees may be struck down.
 
 
 158
 For the reasons assigned heretofore, the judgment of the district court is
 
 
 159
 Affirmed.
 
 
 
 [1]
 The companies are Allegheny-Ludlum Industries, Inc., Armco Steel Corporation, Bethlehem Steel Corporation, Jones and Laughlin Steel Corporation, National Steel Corporation, Republic Steel Corporation, United States Steel Corporation, Wheeling-Pittsburgh Steel Corporation, and Youngstown Sheet & Tube Company. According to one estimate, the complaint reached seventy-three percent of the country's basic steel industry. Brief for the appellee steel companies at 3 n. 2
 
 
 [2]
 See United States v. Allegheny-Ludlum Indus., Inc., N.D.Ala.1974, 63 F.R.D. 1, 3
 
 
 [3]
 The two consent decrees are reprinted in BNA FEP Manual 431:125-152 (1974). The correct entry date, as reflected in the record, is April 12, 1974, rather than April 15
 
 
 [4]
 Paragraph 18(c) of Consent Decree I defines as the affected classes of employees eligible to receive back pay: (1) minority (black and Spanish-American surnamed) employees in Production and Maintenance units who were employed prior to January 1, 1968; (2) all females in Production and Maintenance units as of the date of decree entry; and (3) those former employees who retired on pension within the two years preceding entry of the decrees, who, if they were still employed, would be within group (1) or group (2). Provision is also made for payment of back pay to surviving spouses of otherwise eligible deceased employees
 
 
 [5]
 Paragraph 12 of Consent Decree I provides for a second minority member at plants in which at least ten percent of the employees comprise a second minority group, unless one of the union representatives is already from that minority group
 
 
 [6]
 63 F.R.D. at 4
 
 
 [7]
 A revealing illustration is the purported class action involving United States Steel's Fairfield Works in Alabama, now pending on appeal before this court, No. 73-3907, Ford, et al. v. United States Steel Corp., et al., partially reported below at 371 F.Supp. 1045 (N.D.Ala.1973). Approximately 12,000 people are employed at Fairfield Works, around 3,100 of whom are black. Between six and eight private class actions were consolidated for trial. Back pay was awarded to some members of three classes, but denied as to the other classes. A total of sixty-one people, or thirteen percent of the members of the certified private classes, received back pay awards. The other eighty-seven percent, or 403 blacks, were denied back pay. Nonetheless, in anticipation of the appeal, the district court on May 2, 1973 amended the class certification order to redefine the plaintiff class as: (1) all blacks, except those already members of a private class whose rights had been adjudicated, who had been employed at Fairfield Works at any time prior to January 1, 1973; and (2) all blacks who had unsuccessfully sought employment at Fairfield Works prior to January 1, 1973. Although we have no reliable estimate on the combined size of the resulting class, subclass (1) alone is sufficiently large to have encouraged the defendants to enter into consent decrees with the government, in which $30.9 million is promised in back pay, "several million dollars" of which represents United States Steel's allotment, principally for blacks, but also for female and Spanish-surnamed workers at Fairfield Works. Brief for Appellee United States Steel Corp., at 7, No. 73-3907, Ford, et al. v. United States Steel Corp., et al
 The Fairfield Works case also involved pattern or practice charges brought by the United States, resulting in an appeal by the government from denial of certain injunctive relief and denial of back pay to black employees who were not represented in the private class actions. Since the government is now admittedly satisfied with the rate retention and back pay provisions of subsequently-negotiated Consent Decree I, paragraphs 8 and 18 thereof respectively, it has withdrawn its appeal in Ford pending our decision as to the validity of the consent decrees sub judice. Stipulation of the Parties, filed July 8, 1974.
 Last but not least, in an Order filed December 23, 1974, Judge Pointer entered an unopposed amendment in Ford conforming the injunctive relief for Fairfield Works to that provided by the consent decrees, in all minimum respects except back pay. Since the issue of classwide back pay is still on appeal to this court in Ford, Judge Pointer ordered postponement of further back pay availability in that case until final decision of the appeals in Ford and in this case.
 
 
 [8]
 Paragraph 16 of Consent Decree I contains a corresponding stipulation on behalf of the Secretary of Labor and the Office of Federal Contract Compliance
 
 
 [9]
 Of course, the parties to the decrees will encourage the grievant to proceed initially through Implementation and Audit and Review Committee channels, if the grievant seeks systemic relief. Also, that procedure obviously will be the most viable alternative for employees who reside at a distance from the Northern District of Alabama. Yet the decrees themselves and particularly paragraph 20 of Consent Decree I, see also paragraph 2 of Consent Decree II are open-ended in that they do not purport to impose administrative exhaustion requirements upon the individual in excess of those otherwise imposed by law. Thus, it is quite reasonable to infer that any obstacles which the individual may encounter en route to any given courthouse must arise by virtue of rules of law or compromises that exist independently of the bare terms of the consent decrees. In any event, with respect to questions concerning any matter resolved by the decrees, the parties thereto have stipulated that the district court may assume jurisdiction on its own motion. Hence, the decrees do not by their own force attempt to inhibit anyone's access to judicial process or the availability of judicial review
 
 
 [10]
 The Harris group, certain members of which are the principal appellants herein, consists of seven sub-groups, the first of which claims to represent all black employees, past, present, and future, of all defendant companies at plants in which the Steelworkers' Union is the employees' bargaining representative. The next six sub-groups claim to represent six private classes in pending actions: Harris, et al. v. Republic Steel Corp., et al., N.D.Ala., C.A.No.74-P-3345; Ford, et al. v. United States Steel Corp., et al., N.D.Ala., C.A.No.66-625, see note 7, supra; Taylor, et al. v. Armco Steel Corp., et al., S.D.Tex., C.A.No.68-129; Waker, et al. v. Republic Steel Corp., et al., N.D.Ala. C.A.Nos.71-179, 71-180, 71-181, 71-185; Lane, et al. v. Bethlehem Steel Corp., et al., D.Md., C.A.No.71-580-H; Rodgers, et al. v. United States Steel Corp., et al., W.D.Pa., C.A.No.71-793
 
 
 [11]
 On June 4, 1974, Judge Pointer permitted NOW to file an amended complaint in intervention on behalf of the three women, who represented aggrieved classes of former, present, and future female employees of the defendant steel companies. Judge Pointer also received from NOW extensive briefs concerning the effects of the consent decrees upon the rights of females
 
 
 [12]
 See Alexander v. Gardner-Denver Co., 415 U.S. 36, 52 & n. 15, 94 S.Ct. 1011, 1021 & n. 15, 39 L.Ed.2d 147, 160 & n. 15 (1974)
 
 
 [13]
 The record reflects that attorneys for the Harris group also listed the National Ad Hoc Committee of Steelworkers, as to which the district court denied intervention, in the Harris intervenors' Notice of Appeal. On appeal, however, the Ad Hoc Committee has filed only a brief as Amicus Curiae, joined by the District 31 Committee to Defend the Right to Strike along with the Rank and File Team. Of the issues briefed by Amici, only those relating to the alleged illegality of the back pay releases have been presented to this court by the briefs of NOW, the three women represented by NOW, and the Harris intervenors. The other issues briefed by Amici were not raised in the district court, and for that reason we shall not consider them. Cf. Wisconsin Barge Line, Inc. v. Coastal Marine Transport, Inc., 5 Cir. 1969, 414 F.2d 872, 876, and cases cited
 
 
 [14]
 
 Rule 24.
 Intervention
 (a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
 (b) Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action: (2) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement, or agreement issued or made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.
 (c) Procedure. A person desiring to intervene shall serve a motion to intervene upon the parties as provided in Rule 5. The motion shall state the grounds therefor and shall be accompanied by a pleading setting forth the claim or defense for which intervention is sought. The same procedure shall be followed when a statute of the United States gives a right to intervene. When the constitutionality of an act of Congress affecting the public interest is drawn in question in any action to which the United States or an officer, agency, or employee thereof is not a party, the court shall notify the Attorney General of the United States as provided in Title 28, U.S.C., § 2403.
 As amended Dec. 27, 1946, eff. March 19, 1948; Dec. 29, 1948, eff. Oct. 20, 1949; Jan. 21, 1963, eff. July 1, 1963; Feb. 28, 1966, eff. July 1, 1966.
 
 
 [15]
 NOW informs us that it is one of the plaintiffs in a class action employment discrimination suit pending before the federal district court in Maryland, styled Baltimore Chapter of NOW; Cathleen J. Beasley and Catherine N. Lloyd v. Bethlehem Steel Corp., et al., No. M-74-377. Brief for Appellants NOW, et al., at 6. NOW asserts that its filing of charges with the EEOC, for example on behalf of all female employees of United States Steel at Gary, Indiana (Charge No. TCH 4-1985, filed March, 1974), has been instrumental in generating a favorable climate for conciliation and settlement in the steel industry
 
 
 [16]
 Cf. Sierra Club v. Morton, 405 U.S. 727, 740, 92 S.Ct. 1361, 1368-69, 31 L.Ed.2d 636, 646 (1972):
 The requirement that a party seeking review must allege facts showing that he is himself adversely affected does not insulate executive action from judicial review, nor does it prevent any public interests from being protected through the judicial process. It does serve as at least a rough attempt to put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome. That goal would be undermined were we to construe the APA to authorize judicial review at the behest of organizations or individuals who seek to do no more than vindicate their own value preferences through the judicial process. The principle that the Sierra Club would have us establish in this case would do just that.
 (footnotes omitted).
 But see Warth v. Seldin, --- U.S. ---, ---, 95 S.Ct. 2197, 2211, 44 L.Ed.2d --- (1975):
 There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy. Moreover, in attempting to secure relief from injury to itself the association may assert the rights of its members, at least so long as the challenged infractions adversely affect its members' associational ties.
 In Warth the Court described the question of standing as essentially a matter of "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." --- U.S. at ---, 95 S.Ct. at 2207 (footnote omitted). Note that whereas § 706(f)(1) of Title VII creates civil actions and rights of intervention in favor of "Person(s) aggrieved," § 703, 42 U.S.C. § 2000e-2, makes it unlawful to discriminate against "any individual." (emphasis added).
 
 
 [17]
 As of March 24, 1974, the EEOC assumed the full range of "pattern or practice" functions which had belonged to the Justice Department since the effective date of Title VII, July 2, 1965. Accordingly, NOW appears to accept as correct our statement in the text, that this was a § 707 "pattern or practice" action. Brief for Appellants NOW, et al., at 6
 
 
 [18]
 28 U.S.C. § 1345: "Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress." See United States v. Local 189, United Papermakers, E.D.La.1968, 282 F.Supp. 39, 43, aff'd, 5 Cir. 1969, 416 F.2d 980, cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970)
 
 
 [19]
 H. Rep. No. 92-238, reporting H.R. 1746, 92d Cong., 2d Sess., 1972 U.S.Code Cong. & Admin.News 2137, at 2164 (reporting § 707(f) of H.R. 1746)
 
 
 [20]
 A labor union is elected to represent in collective bargaining the employees who depend on the company for their jobs and livelihood. When the company, as in American Tel. & Tel., enters into a settlement with the government in an effort to resolve complaints of alleged employment discrimination, the union derivatively acquires a mandatory duty to negotiate alternatives to the provisions e. g., those relating to seniority, or as in the Bell case pregnancy leave of the existing collective bargaining contract. If the settlement contains features the legality or propriety of which is questionable, then the union may have a definite, cognizable interest qua union in contesting those features. Cf. Kilberg, Current Civil Rights Problems in the Collective Bargaining Process: The Bethlehem and AT&T Experiences, 27 Vand.L.Rev. 81, 101, 106 (1974). Furthermore, the union's ability to protect its interest may well be impaired or impeded if it is not allowed to intervene in the settlement formalization proceedings. Id. At the very least, it would be anomalous to assume in such cases that the employees' bargaining representative's interest is adequately served by the government or the employer. Nevertheless, the union must carefully tailor its role in intervention in order not to unduly favor or discriminate against the interests of particular segments of its membership. See EEOC v. American Tel. & Tel. Co., 3 Cir. 1974, 506 F.2d 735, 741
 
 
 [21]
 For that reason, NOW's reliance on cases such as Trbovich v. UMW, 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972), is misplaced. Trbovich was an action by the Secretary of Labor under § 482(b) of the LMRDA, 29 U.S.C. § 401 et seq., to set aside a union's election of officers because of alleged violations of Title IV of the Act, § 481 et seq. The statute provided that the suit by the Secretary constituted the exclusive remedy, and union members are barred by law from bringing private actions. Since the Secretary thus functioned as the union members' only advocate for the protection of their valuable rights against the union, and because of the Secretary's corresponding and potentially conflicting duty to consider the broader public interest, the Court held that the union member who filed the original complaint with the Secretary was entitled to limited intervention under Rule 24(a)(2). Here, by contrast, although the government was obliged to represent the public interest, the consent decrees do not purport to affect the availability of relief from employment discrimination through private actions under Title VII, the Civil Rights Act of 1866 (42 U.S.C. § 1981), the labor law duty of fair representation, or any other applicable federal law. Compare Hodgson v. UMW, 1972, 153 U.S.App.D.C. 407, 473 F.2d 118, 122 n. 15, 128-30 (suit by Secretary under Title III of LMRDA is res judicata as against union members; Rule 24(a) (2) intervention allowed)
 Also to be distinguished are cases such as Atlantis Development Corp. v. United States, 5 Cir. 1967, 379 F.2d 818 (title to property); Martin v. Travelers Indem. Co., 5 Cir. 1971, 450 F.2d 542 (liability insurance coverage); and Nuesse v. Camp, 1967, 128 U.S.App.D.C. 172, 385 F.2d 694 (conflict between federal banking laws and state law), in which courts have granted (a)(2) intervention because of the practical disadvantages that would follow from peculiar stare decisis effects, if intervention were not allowed. Again contrasting this case, we have difficulty conceiving of how the consent decrees products of negotiation rather than contested litigation are likely to carry stare decisis effects measurably adverse to NOW or its membership in any future proceeding. A careful analysis of the decrees demonstrates that such an assumption would be not only quite premature, but also naively critical of the perceptive abilities of the judiciary. See Judge Motley's lucid discussion in Leisner v. New York Tel. Co., S.D.N.Y.1973, 358 F.Supp. 359, 369-70. Cf. Pettway v. American Cast Iron Pipe Co., 5 Cir. 1974, 494 F.2d 211, 221 n. 21; Rodriguez v. East Texas Motor Freight, 5 Cir. 1974, 505 F.2d 40, at p. 65; Dickerson v. United States Steel Corp., E.D.Pa.1974, 64 F.R.D. 351.
 In no respect does this case bear genuine resemblance to the kind of bizarre problems encountered in Cascade Natural Gas Corp. v. El Paso Natural Gas Co., 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967). See Kaplan, Continuing Work of the Civil Committee: (etc.) (I ), 81 Harv.L.Rev. 356, 405-06 (1967).
 
 
 [22]
 Although we have determined that intervention as of right under F.R.Civ.P. 24(a)(1) was not available to the private parties and groups who sought intervention in this case, some of whose applications were granted below on the assumption that § 706(f)(1) of Title VII conferred such right, we proceed nonetheless to consider the merits of the attacks lodged against the consent decrees by the remaining intervenors-appellants. We do so on the assumption that the district court, having concluded that certain parties ought to be granted intervention either by right or by permission, would have allowed those parties to intervene in any event under either 24(a)(2) or (b). No appellee has suggested by way of cross-assignment or otherwise that we should not go forward to the merits
 
 
 [23]
 Accord, Guerra v. Manchester Terminal Corp., 5 Cir. 1974, 498 F.2d 641, 650; Airline Stewards and Stewardesses v. American Airlines, Inc., 7 Cir. 1972, 455 F.2d 101, 109; Fekete v. United States Steel Corp., 3 Cir. 1970, 424 F.2d 331, 336; Bowe v. Colgate-Palmolive Co., 7 Cir. 1969, 416 F.2d 711; Jenkins v. United Gas Corp., 5 Cir. 1968, 400 F.2d 28
 
 
 [24]
 Statements to the same effect may be found in virtually all of the cases which we have canvassed in stressing the importance of conciliation and settlement, and in legion others as well. See, e. g., Gamble v. Birmingham Southern R. R., 5 Cir. 1975, 514 F.2d 678, at p. 686. To repeat the citations would be superfluous in view of the Supreme Court's repeated and emphatic recognition of the important enforcement role played by private suitors
 
 
 [25]
 According to one fairly recent source, the EEOC to no one's surprise "suffers from a considerable work backlog." It is reported that as of June 30, 1971, some 32,000 cases were backlogged, and that the processing of a charge may consume eighteen to twenty-four months. Further, after the EEOC finds reasonable cause, another six months usually passes before it seeks conciliation
 In fiscal 1972, the last year prior to implementation of the 1972 amendments which gave the EEOC power to sue, the Commission found reasonable cause to assert unlawful discrimination against only 1,390 employers. Settlement was attempted to some degree with 792 of these employers, but only 268 attempts resulted in a partial or complete success. Note, The Tentative Settlement Class and Class Action Suits Under Title VII of the Civil Rights Act, 72 Mich.L.Rev. 1462, 1463 n. 11, 1464 n. 17 (1974).
 Another source reports that as of the close of fiscal 1974, the EEOC's backlog had grown to nearly 98,000 charges. 181 BNA DLR D-1, 5 (Sept. 17, 1974).
 
 
 [26]
 In this respect, the consent decrees present a situation somewhat analogous to that recently examined by the Supreme Court in Johnson v. Railway Express Agency, Inc., --- U.S. ---, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). In Johnson it was argued that the timely filing of an employment discrimination charge with the EEOC, pursuant to Title VII, should be held to toll the applicable state statute of limitations for a suit under 42 U.S.C. § 1981 on the same cause of action. Rejecting the argument, the Supreme Court reiterated the theme of Gardner-Denver that the various legal remedies for employment discrimination are cumulative and complementary. From the grievant's standpoint, "(u)nder some circumstances, the administrative route may be highly preferred over the litigatory; under others the reverse may be true." --- U.S. at ---, 95 S.Ct. at 1720, 44 L.Ed.2d at 302
 The most significant feature about Johnson is its emphasis on the principle that the choice over which way to proceed belongs to the grievant:
 Petitioner argues that a failure to toll the limitation period in this case will conflict seriously with the broad remedial and humane purposes of Title VII. Specifically, he urges that Title VII embodies a strong federal policy in support of conciliation and voluntary compliance as a means of achieving the statutory mandate of equal employment opportunity. He suggests that failure to toll the statute on a § 1981 claim during the pendency of an administrative complaint in the EEOC would force a plaintiff into premature and expensive litigation that would destroy all chances for administrative conciliation and voluntary compliance.
 We have noted this possibility and, indeed, it is conceivable, and perhaps almost to be expected, that failure to toll will have the effect of pressing a civil rights complainant who values his § 1981 claim into court before the EEOC has completed its administrative proceeding. (footnote omitted). * * * But the fundamental answer to petitioner's argument lies in the fact presumably a happy one for the civil rights claimant that Congress clearly has retained § 1981 as a remedy against employment discrimination separate from and independent of the more elaborate and time consuming procedures of Title VII.
 --- U.S. at ---, 95 S.Ct. at 1722, 44 L.Ed.2d at 304. Likewise in this case, individual employees will find themselves faced with the choice whether to timely accept back pay under the consent decrees, for which no litigation will be necessary, or file private charges and/or lawsuits and risk the usual litigatory uncertainties in quests for greater recoveries. We know of no policy or rule of law, however, which forbids the erection of such a choice when its effect is to leave the individual grievant in a position no worse, but in fact better, than that occupied in the absence of the settlement, which, of course, is not binding on the individual unless he or she so desires.
 
 
 [27]
 E. g., West Virginia v. Chas. Pfizer & Co., S.D.N.Y.1970, 314 F.Supp. 710, 740, aff'd, 2 Cir. 1971, 440 F.2d 1079, cert. denied, sub nom., Cotler Drugs, Inc. v. Chas. Pfizer & Co., 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971) ("fair, reasonable, and adequate"); McCray v. Beatty, D.N.J.1974, 64 F.R.D. 107, 110 (court "would not approve a settlement that appeared inequitable or unfair to any party to the suit")
 
 
 [28]
 The extremely dubious validity of the appellants' implication is highlighted by certain examples. Although Title VII had been in effect almost nine years at the time of the consent decrees' entry, private actions had been instituted at no more than a dozen of the 250 plants covered by the decrees. Of these private actions, only one had proceeded to final judgment, the Fairfield Works case, see note 7, supra. In that case sweeping injunctive reforms were ordered and implemented, but the district court denied back pay to the overwhelming majority of aggrieved steelworkers. Whereas the consent settlement extends offers of back pay to all production and maintenance minority employees hired before 1968 and all female employees hired before the date of the decrees, the back pay awarded in the Fairfield case was limited to sixty-one blacks hired before 1963
 Furthermore, the Fairfield order provided affirmative relief only to blacks. The consent decrees provide such relief to females and Spanish-surnamed Americans as well. Consent Decree II, for example, establishes as an interim affirmative goal that twenty percent of all new hires in production and maintenance departments shall be females.
 Also, the order in Fairfield provided for rate retention only to blacks who transferred within three years of the date of the order. Consent Decree I creates a rate retention remedy which applies to all female and minority employees with plant seniority as of January 1, 1968, and who may wish to transfer at any time in the future. The rate retention in Fairfield lasted for only one year following transfer; the retention period under Consent Decree I continues for up to two years.
 Finally, the time factor alone is illuminating as it surfaces in these cases. It took six months to try the Fairfield suit. The relief eventually ordered there is no more impressive than the reforms which were hammered out by the government, the steel companies, and the union during six months of negotiations. If we consider back pay, then the Fairfield relief per capita is far less than under the decrees. The appellants here do not dispute the steel companies' estimate that if an equivalent amount of time were used to litigate the issues at each of the 250 plants covered by the decrees, it would take at that rate ten years to try just the liability issues. If after trial the back pay issues were referred to a special master for individualized computations, after giving consideration to various defenses, including lack of qualification, voluntary freezing, refusal to bid, and physical fitness, and if one hour were allotted each of 60,000 claimants, over twenty-eight years of trial time could be consumed. Brief for appellee steel companies at 11 n. 14.
 
 
 [29]
 Subsection (e) of paragraph 18 sets forth the factors to be considered by the Audit and Review Committee in identifying eligible recipients and computing individual awards. Those employees who have been most adversely affected for the longest periods are supposed to receive the highest sums. The average award is approximately $500 ($30,940,000) divided by 60,000 black, Latin American, and female employees). Some employees will receive more, others will receive less; but in no event will an electing eligible employee, see paragraph 18(c) of Consent Decree I and footnote 4, supra, whose plant service antedates 1968 receive less than $250. All females who were employed in a production and maintenance unit as of the date of decree entry are eligible for back pay. We were advised at oral argument tht the individual awards will represent pro rata shares across the memberships of particular seniority subclasses. Such a method designed to equitably and efficiently distribute the gross recovery was approved in Pettway, supra, 494 F.2d at 263 n. 154. Obviously, there is no single "correct" formula
 
 
 [30]
 The provision for the release by electing employees of claims against the defendants in exchange for back pay was patterned after the release which was utilized with the Bell System consent decree, EEOC v. American Tel. & Tel., supra. See BNA FEP Manual 431:73, at 431:77, 431:79 (parts A VIII.A; B II.B.). Whereas the Bell release encompassed "any claims for alleged violations . . . based upon occurrences prior to" the date of decree entry, Consent Decree I specifically provides for the release of "any claims . . . resulting from any alleged violations . . . occurring on or before" entry date, and for "any damages" suffered after decree entry "by reason of continued effects" of pre-decree discriminatory acts or practices. Although the appellants here presume that the language of the Bell release necessarily falls short of any compromise as to continued effects, the difference is not entirely apparent to us. If the parties to this decree had not inserted the additional specific limitaton concerning continued effects, but which is itself restricted to claims for damages, it seems that both releases reasonably could be thought to mean the same thing: i. e., a bar to additional relief of any kind for continuing effects of past discriminations. Cf. A. Corbin, Contracts § 598, at 588 (1960). Since under our analysis of the law we think such a release could be valid, but since at the same time the release sub judice does not cover every item that other parties might choose to include, it is unnecessary for us to place a definitive construction on the Bell release or attempt to reconcile its meaning with that of any other release
 
 
 [31]
 63 F.R.D. at 7
 
 
 [32]
 See also Rodriguez v. East Texas Motor Freight, supra, 505 F.2d at 64 at 1284-87; Bing v. Roadway Express, Inc., 5 Cir. 1973, 485 F.2d 441, 450; United States v. Bethlehem Steel Corp., 2 Cir. 1971, 446 F.2d 652, 660; United States v. Jacksonville Terminal Co., 5 Cir. 1971, 451 F.2d 418, 452, cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972); Local 189, United Papermakers v. United States, 5 Cir. 1969, 416 F.2d 980, 988, cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970). See generally Note, Title VII, Seniority Discrimination, and the Incumbent Negro, 80 Harv.L.Rev. 1260, 1266-82 (1967). Of course, the remedy of rate retention, see note 28, supra, operates to reduce the lag employees experience in reaching their rightful places by encouraging them to take advantage of opportunities to transfer into new jobs. See United States v. Bethlehem Steel Corp., supra, 446 F.2d at 660
 
 
 [33]
 When mammoth groups of affected employees are involved, as here, individual back pay awards can only be calculated by a process fraught with speculation and conjecture. See Pettway, supra, 494 F.2d at 260-62
 
 
 [34]
 See also D. A. Schulte, Inc. v. Gangi, 328 U.S. 108, 66 S.Ct. 925, 90 L.Ed. 1114 (1946); Martino v. Michigan Window Cleaning Co., 327 U.S. 173, 66 S.Ct. 379, 90 L.Ed. 603 (1945); Philadelphia, B. & W. R. R. v. Schubert, 224 U.S. 603, 32 S.Ct. 589, 56 L.Ed. 911 (1912) (stipulation for release of railroad's negligence liability in return for participation in relief fund held unenforceable under FELA); Torres v. American R. R. of Porto Rico, 4 Cir. 1946, 157 F.2d 255, cert. denied, 329 U.S. 782, 67 S.Ct. 204, 91 L.Ed. 671 (1947); Bingham v. Airport Limousine Service, W.D.Ark.1970, 314 F.Supp. 565; Baker v. California Shipbuilding Corp., S.D.Cal.1947, 73 F.Supp. 322. But see Boyd v. Grand Trunk Western Ry., 338 U.S. 263, 266, 70 S.Ct. 26, 28, 94 L.Ed. 55, 57 (1949); Callen v. Pennsylvania R. R., 332 U.S. 625, 631, 68 S.Ct. 296, 298, 92 L.Ed. 242, 246 (1948); Garrett v. Moore-McCormick Co., Inc., 317 U.S. 239, 248, 63 S.Ct. 246, 252, 87 L.Ed. 239, 245 (1942); Blanco v. Moran Shipping Co., 5 Cir. 1973, 483 F.2d 63, cert. denied, 416 U.S. 904, 94 S.Ct. 1608, 40 L.Ed.2d 108 (1974); Antonioli v. Lehigh Coal & Nav. Co., 3 Cir. 1971, 451 F.2d 1171, 1175 n. 15, cert. denied, 406 U.S. 906, 92 S.Ct. 1608, 31 L.Ed.2d 816 (1972); Urbino v. Puerto Rico Ry. Light & Power Co., 1 Cir. 1947, 164 F.2d 12, 14
 
 
 [35]
 The Court also emphasized that "the arbitrator has authority to resolve only questions of contractual rights"; that the nondiscrimination clause of the collective bargaining contract may differ from the language of Title VII; and that judicial review of final and binding decisions in arbitration is narrowly circumscribed by the Steelworkers Trilogy. 415 U.S. at 53, 94 S.Ct. at 1022, 39 L.Ed.2d at 160
 
 
 [36]
 See the discussion at footnotes 85-86, infra, and accompanying text. See also Johnson v. Georgia Highway Express, Inc., 5 Cir. 1969, 417 F.2d 1122, 1127 (Title VII class action under F.R.Civ.P. 23(b)(2), seeking systemic injunctive relief and back pay; Godbold, J., specially concurring):
 Some of the difficulty may be sifted out by findings of the trial court at or during the trial that the plaintiff adequately represents the class. But this issue itself may be determined in the absence of 99.9% of those affected, who have had no notice or service of process or right to be heard and who may feel that the plaintiff in the particular case (or his counsel, or both) is the last person they want representing them.
 (footnote omitted). Cf. Miller v. Mackey International, Inc., 5 Cir. 1975, 515 F.2d 241, at p. 244 (F.R.Civ.P. 23(b)(3) class action; Bell, J., specially concurring; arguing for opt-in class actions when large numbers of putative members are involved).
 
 
 [37]
 Under § 706(b) of Title VII, 42 U.S.C. § 2000e-5(b), the EEOC is obligated to attempt to conciliate employment discrimination charges upon which the Commission has found "reasonable cause." If it appears that a charge can be resolved informally, the EEOC affords the aggrieved party an opportunity to participate in the settlement. See § 706(f)(1). A typical conciliation agreement reads as follows:
 The Charging Party deems this Agreement to be fair and equitable, and hereby waives, releases and covenants not to sue the Respondent with respect to any matters which were or might have been alleged as charges filed with the Equal Employment Opportunity Commission, subject to performance by the Respondent of the promises and representations contained herein. . . .
 
 
 [1]
 CCH Emp. Prac. Guide P 1680.02, at 1449 (1973) (emphasis added)
 The legislative history of the 1972 amendments to Title VII leaves no doubt that persons who execute such conciliation agreements may not thereafter maintain lawsuits against respondents.
 (The enacted bill) contains . . . a provision for termination of the right of private action once the Commission . . . enters into a conciliation or settlement agreement which is satisfactory to the Commission and to the person aggrieved. If such an agreement is not acceptable to the aggrieved party, his private right of action is preserved.
 H.Rep.No.92-238, reporting H.R. 1746, 92d Cong., 2d Sess., 1972 U.S.Code Cong. & Admin.News, 2137, at 2148 (reporting § 715 of H.R. 1746). See also Leisner v. New York Tel. Co., S.D.N.Y.1973, 358 F.Supp. 359, 367.
 
 
 [38]
 We hold, therefore, that the consent decree does not operate as collateral estoppel to prohibit any members of the plaintiff class from participating in relief in this case. (citation omitted). Those members of the plaintiff class who accept compensation under the consent decree and sign a release, of course, are bound by the terms of the release. But no other members of the plaintiff class lose any right to relief in the instant case
 505 F.2d at p. 65 (emphasis added). See also Pettway v. American Cast Iron Pipe Co., supra, 494 F.2d at 267 (Bell, J., specially concurring) (encouraging use of consent decrees to settle back pay claims); United States v. Georgia Power Co., N.D.Ga. Jan. 31, 1974, No. 12355, at 14 ("Amended and Final Decree" following our remand; employees must execute "general release" as condition of obtaining back pay in government pattern or practice suit; approved in Pettway, supra, 494 F.2d at 262 n. 152, 264 n. 156a).
 
 
 [39]
 "Nor do we need to consider here the possibility of compromises in other situations which may arise, such as a dispute over the number of hours worked or the regular rate of employment." 328 U.S. at 114, 66 S.Ct. at 928, 90 L.Ed. at 1118
 
 
 [40]
 317 U.S. at 248, 63 S.Ct. at 252, 87 L.Ed. at 245. The Court added that "(t)he adequacy of the consideration and the nature of the medical and legal advice available to the seaman at the time of signing the release are relevant to an appraisal of this understanding." Id. (footnote omitted)
 
 
 [41]
 See also Antonioli v. Lehigh Coal & Nav. Co., supra note 34
 
 
 [42]
 It is interesting to note that when Congress enacted the Portal-to-Portal Pay Act, it listed as one of the prompting considerations that, if the Supreme Court's line of decisions under the FLSA were allowed to persist, "the courts of the country would be burdened with excessive and needless litigation and champertous practices would be encouraged." Act of May 14, 1947, c. 52, § 1, 61 Stat. 84, 29 U.S.C. § 251(a)(7)
 
 
 [43]
 See Pettway, supra, 494 F.2d at 261:
 (W)hen the class size or the ambiguity of promotion or hiring practices or the multiple effects of discriminatory practices or the illegal practices continued over an extended period of time calls forth the guagmire of hypothetical judgment discussed earlier, a class-wide approach to the measure of back pay is necessitated. It should be emphasized that this is not a choice between one approach more precise than another. Any method is simply a process of conjectures.
 (footnotes omitted).
 
 
 [44]
 Cf. Id. at n. 151: "The process of computation and burden of proof is not an 'either, or' approach."
 
 
 [45]
 A tactic whose likelihood of success we consider an open question. Compare Williamson v. Bethlehem Steel Corp., supra, 468 F.2d at 1203 (private parties are not bound by success or failure of the government in a "pattern or practice" action), with Pettway v. American Cast Iron Pipe Co., supra, 494 F.2d at 258 (back pay normally stops accruing when reformed seniority goes into effect)
 
 
 [46]
 Brief for appellants, Harris, et al., at 31 (emphasis added)
 
 
 [47]
 The method utilized by Judge Pointer for computing and awarding back pay within the three Fairfield departments and corresponding private classes as to which he found that the seniority system had caused economic damages to blacks is set forth in 371 F.Supp. at 1060. Generally speaking, the court awarded the fund generated by each class's proof on a "winner take all" basis to the "oldest" blacks in the class from the standpoint of plant seniority in light of a hypothetical reconstruction of employment histories which had been dominated by "younger" whites and to some degree post-Act-hired blacks between July 2, 1965 and the entry of the court's remedial decree. Thus, for purposes of awarding back pay, the "oldest" blacks were permitted to "leap-frog" in order of plant seniority. Once the historic vacancies in pertinent LOPs had been accounted for, however, no more blacks in the three successful classes received back pay
 The relatively small total membership (approximately 360) of those three classes made the reconstruction method feasible on an individualized basis by virtue of the court's assumption of blacks' equal fitness for promotion when competing with whites in the line, and devotion of each flow chart to a single LOP. With this group of blacks, but especially with a larger group, other methods of classwide distribution might have been used, see note 29, supra, but no one complained on appeal about the method selected by Judge Pointer. Interestingly, if the court had used a pro rata schedule, the average recovery per claimant assuming some recovery by each claimant would have been somewhat as follows: the Hardy class 154 blacks at $280 each; the McKinstry class 170 blacks at $270 each; the Ford class 35 blacks at $3,200 each. In summary, although precise comparison is impossible absent data on the numbers of class members who were hired after 1967 and are thus ineligible for back pay under the Consent Decree, it remains reasonably clear that of the three successful classes, only the smallest the Ford group benefitted on the average per claimant from contested litigation. Of course, since the decree does not offer settlement of back pay claims to post-1967 black male hires in the steel industry, the presence of such hires in the Fairfield private classes should cancel out for purposes of comparing per claimant average recoveries under both the Fairfield decree and the Consent Decree. In other words, the average recovery per eligible claimant still should be greater under the decree. If the fifty percent "future pay" increment used by Judge Pointer in Fairfield is factored out, then the difference increases accordingly.
 
 
 [48]
 (T)he Commission asserts that the relief afforded by the proposed settlement is substantially narrower than it would be if the suits were to be successfully litigated. This is precisely the sort of gratuitous opinion that the parties are entitled not to have foisted upon them under the scheme of Title VII. Suffice it to say that as a general proposition the public interest may indeed be served by a voluntary settlement in which each side gives ground in the interest of avoiding litigation. This is especially true within the confines of Title VII where "there is great emphasis . . . on private settlement and the elimination of unfair practices without litigation." (citing Oatis, Culpepper, and Bowe v. Colgate-Palmolive Co., supra )
 455 F.2d at 109.
 
 
 [49]
 63 F.R.D. at 5-6. Judge Pointer explained:
 The decrees may require clarification in some particulars and, indeed, as administration of the decrees continues, there will doubtless be problems which were not considered or anticipated by the parties or which run counter to their expectations during negotiations. Should such eventualities occur, this court, by virtue of paragraph 20 of Consent Decree I and paragraph 2 of Consent Decree II, has jurisdiction of this cause for the purpose of issuing subsequent orders, consistent with principles of due process, as necessary to further the purposes and objectives of these decrees.
 
 
 [63]
 F.R.D. at 6. (footnotes omitted). This pronouncement, of which no one complains, came on the heels of a stipulation by all parties to the decrees that the district court "will have the full panoply of powers traditionally enjoyed by equity courts in enforcing consent decrees powers which are substantial. See, e. g., United States v. Swift (& Co.), 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999, 1005 (1932); United States v. Armour & Co., 402 U.S. 672, 674-5, 91 S.Ct. 1752, 29 L.Ed.2d 256 and note two thereat, (402 U.S. 673, 675, 91 S.Ct. 1752, 1754 n. 2, 29 L.Ed.2d 256, 259 n. 2) (1971). . . ." The stipulation was precipitated by Judge Pointer's earlier indication in open court that he would not approve an agreement which restricted the judicial role to administration of a "dry trust arrangement." Appendix at 160. Nonetheless, in addition to joining the stipulation, each party to the decrees affirmatively disclaimed any desire to withdraw from the settlement
 
 
 [50]
 Brief for Appellants Harris, et al., at 45 (emphasis added)
 
 
 [51]
 Thus, the argument by appellants that the review procedure under the decrees resembles the union and management-controlled Railroad Adjustment Board in Glover v. St. Louis-San Francisco Ry., 393 U.S. 324, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969), is inaccurate. Here, not only may the government unilaterally take matters before the court if the company or union delegations of the Audit and Review Committee fail to agree with the government, but also the court may exercise jurisdiction on its own motion, and furthermore aggrieved employees may go to court in the variety of ways discussed heretofore, none of which is restricted by any exhaustion requirement imposed by the decrees themselves
 
 
 [52]
 For this reason, appellants' contention that the consent decrees may operate to effectively repeal the venue provisions of Title VII, § 706(f)(3), 42 U.S.C. § 2000e-5(f)(3), is without merit. If, for example, a private individual filed suit in the Western District of Pennsylvania seeking systemic relief additional to or inconsistent with that provided by the decrees, then potentially the court could transfer the action to the Northern District of Alabama, if, for example, the relevant employment records were kept there, and the transfer was "(f)or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). Obviously, the issue in each such action will turn on the particular circumstances, and such questions as transfer, stay as a matter of comity to allow the Audit and Review Committee or Judge Pointer to resolve the grievance, or dismissal (with or without prejudice) if the grievance is already remedied, will properly belong to the judge of the forum court. Appellants are wrong in suggesting that federal judges will somehow view the decrees as an excuse to refuse to follow the law
 Similarly, appellants are incorrect in contending that the court below lacked jurisdiction to approve the decrees. Appellants rely on an assumption that a federal court is without authority to enjoin the United States into performance of its promise in paragraph C, or to hold the government in contempt for failure to so perform. We need not decide this question, for the res judicata effect of paragraph C constitutes ample "case or controversy" consideration for the settlement. If appellants' point were some day sustained, then perhaps one could say that the defendants lost on part of the bargain (though no defendant suggests that it expects ever to seek an injunction or contempt order against the government). That, however, would not destroy nunc pro tunc the court's jurisdiction to enter the decrees. See notes 17 and 18, supra, and accompanying text.
 
 
 [53]
 63 F.R.D. at 6
 
 
 [54]
 See note 48, supra, and accompanying text. See also Dickerson, supra
 
 
 [55]
 Assume for purposes of illustration that the government had pressed its "pattern or practice" complaint in this case through contested litigation, and that the court was in the process of formulating an injunction for implementation at major steel plants operated by each of the defendants. Assume also that private actions for systemic seniority relief at those plants were then pending against the same defendants before various other district courts. There are a variety of ways in which the government could bring to those courts' attention matters which it deemed of significant public interest. For example, suppose the involved agencies felt that the public interest would be served by uniform seniority reforms. The EEOC could assert this view in an application for permissive intervention under § 706(f)(1) of Title VII, or as amicus, see, e. g., Bing v. Roadway Express, Inc., supra, or, presumably, through the Justice Department by way of suggestion. See 28 U.S.C. § 517. Cf. International Prods. Corp. v. Koons, 2 Cir. 1963, 325 F.2d 403 (State Department). Likewise, the Justice Department could apply for intervention under F.R.Civ.P. 24, in order to assert the Secretary of Labor's desire for uniform treatment of issues which implicated the administration of Executive Order 11246. Alternatively, the Justice Department could file an amicus brief or suggestion on behalf of the Secretary. In fact, no reason appears why amicus briefs or suggestions could not be filed even subsequent to entry of a final judgment in the "pattern or practice" action. Thus, in the case before us the only thing that has changed is the capacity in which the plaintiffs intend to assert the public interest in uniformity. Because the consent decrees are already res judicata, the government, generally speaking, will not attempt to intervene in private actions and thereby become a suitor. It will instead file advisory suggestions or amicus submissions with the forum courts. If the government could permissibly do an equivalent thing in an atmosphere of contested litigation, then we fail to see how the substitution of voluntary compliance through consent decrees might alter the result, unless one assumes that settlement is inherently less effective relief-wise than litigation and that its effects are therefore to be discouraged. Appellants have not shown that to be the case
 
 
 [56]
 See note 50, supra, and accompanying text
 
 
 [57]
 A case cited by appellants, Adams v. Richardson, 1973, 156 U.S.App.D.C. 267, 480 F.2d 1159 (en banc), offers them no comfort. There the court affirmed an injunction ordering the Department of Health, Education, and Welfare to perform certain responsibilities under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., which were entrusted to the agency by Congress in order to prevent the disbursement of federal aid to segregated school systems. Apart from involving an entirely different statute, § 2000d-1, under which HEW not only was authorized but also "directed to effectuate" the edict of § 2000d, Adams presented the rather untenable argument that the means of enforcement chosen by the agency was absolutely unreviewable. The court rejected the argument, yet it did so on surprisingly narrow grounds. It ruled that "(a) consistent failure to (initiate aid termination proceedings) is a dereliction of duty reviewable in the courts." 480 F.2d at 1163 (footnote omitted). Here, by contrast, no one contends that EEOC enforcement decisions are unreviewable; indeed, though our scope of review is narrow, we understand our role to require thorough exploration of legal details. Moreover, no one contends that the EEOC has embarked upon a consistent course of "dismantling" Title VII. Such an argument would be ludicrous. If it constitutes a precondition to judicial review of the Commission's exercise of discretion, then it would seem that we have already exceeded the proper scope of our review
 
 
 [58]
 During the first two fiscal years in which the EEOC had the power to sue under § 706, less than two-tenths of one percent of over 100,000 charges filed resulted in actual litigation. Statements by former EEOC Chairman Powell before House Labor Subcommittee on Equal Opportunities, 181 BNA DLR D-1, 2-5 (Sept. 17, 1974)
 
 
 [59]
 Miller v. International Paper Co., 5 Cir. 1969, 408 F.2d 283, 291 (emphasis added). See Gamble v. Birmingham Southern R. R., 5 Cir. 1975, 514 F.2d 678, at p. 688; Danner v. Phillips Petroleum Co., 5 Cir. 1971, 447 F.2d 159, 161. See also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 798-800, 93 S.Ct. 1817, 1822-23, 36 L.Ed.2d 668, 675 (1973); Beverly v. Lone Star Lead Const. Corp., 5 Cir. 1971, 437 F.2d 1136
 
 
 [60]
 Brief for Appellants Harris, et al., at 56
 
 
 [61]
 For example, a charge may complain of a practice such as departmental seniority which in numerous respects is treated by Consent Decree I. However, the specific grievance may relate to a line of progression or seniority rule for which detailed relief has not yet been formulated pursuant to pre-January 1975 reviews. See Consent Decree I, paragraphs 4(a)(2), 6, and 7(d). The EEOC will conciliate such charges. Moreover, the charging party will not have to make an election over whether to sign a release in return for back pay until informal pursuit of appropriate individualized relief succeeds or fails, which should occur within one year after the initial tender of back pay at his or her plant. Consent Decree I, paragraph 19(b), (c)
 
 
 [62]
 This is best illustrated by the charging party's unconditional right to intervene in order to protect his or her own interests in a § 706 suit brought by the Commission, which otherwise cuts off the private party's right to sue under Title VII. See § 706(f)(1), 42 U.S.C. § 2000e-5(f)(1)
 
 
 [63]
 By virtue of this rule, each of the intervenors-appellants is already a member of a putative plaintiff class in a pending private action which was instituted without waiting for the EEOC to complete conciliation efforts. Thus, appellants' concerns about conciliation seem rather ironic at this point, although we have assumed their standing to raise the issue since no appellee has contested standing
 
 
 [64]
 3 C.F.R. at 177 (1974). Section 401 provides:
 The Secretary of Labor may delegate to any officer, agency, or employee in the executive branch of the Government, any function or duty of the Secretary under Parts II (nondiscrimination in employment) and III (nondiscrimination provisions in federal construction contracts) of this Order, except authority to promulgate rules and regulations of a general nature.
 
 
 [65]
 Executive Order 11246, § 209(a)(2), 3 C.F.R. at 173-74 (1974)
 
 
 [66]
 Id. § 209(a)(5)
 
 
 [67]
 Id. § 209(a)(6)
 
 
 [68]
 Id. § 202(1), 3 C.F.R. at 170 (1974); 41 C.F.R. §§ 60-1.40, 60-2.1 et seq. (1974)
 
 
 [69]
 41 C.F.R. § 60-2.1 et seq. (1974). Revised Order No. 4 provides, inter alia, that affirmative action plans "must include an analysis of areas in which the contractor is deficient in the utilization of minority groups and women. . . . " Id. § 60-2.10 et seq
 
 
 [71]
 Appellants appear to complain, for example, that paragraph 3(e) of the Agreement accompanying Consent Decree II amounts to a promise by the OFCC to allow the Audit and Review Committee to finally decide any disputes that may arise under Executive Order 11246. Paragraph 3(e) simply means that the company and the government representative, who is the Secretary's delegate as well, shall have an opportunity to resolve the matter before drastic sanctions such as contract cancellation are invoked. This is entirely consistent with § 209(b) of the Executive Order, which requires efforts to conciliate disputes voluntarily prior to seeking court orders or cancelling contracts. 3 C.F.R. at 174 (1974). See also § 205, Id. at 172 (contracting officers are to seek compliance through "conference, conciliation, mediation, or persuasion")
 
 
 [72]
 See note 18, supra, and accompanying text
 
 
 [73]
 See, e. g., Franks v. Bowman Transp. Co., 5 Cir. 1974, 495 F.2d 398, 421, cert. granted, 95 S.Ct. 1421 (1975); Pettway, supra, 494 F.2d at 263-64; Brown v. Gaston County Dyeing Machine Co., 4 Cir. 1972, 457 F.2d 1377, 1383; United States v. IBEW, 6 Cir. 1970, 428 F.2d 144, 151; Parham v. Southwestern Bell Tel. Co., 8 Cir. 1970, 433 F.2d 421, 428
 
 
 [74]
 E. G., Raney v. Board of Education of Gould School Dist., 391 U.S. 443, 449, 88 S.Ct. 1697, 1700, 20 L.Ed.2d 727, 732 (1968); Green v. County School Bd. of New Kent County, 391 U.S. 430, 439, 88 S.Ct. 1689, 1695, 20 L.Ed.2d 716, 724 (1968); Singleton v. Jackson Municipal Separate School Dist., 5 Cir. 1969, 419 F.2d 1211 vacated in part, 396 U.S. 226, 90 S.Ct. 467, 24 L.Ed.2d 382 (1969), rev'd in part, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477, cert. denied, 396 U.S. 1032, 90 S.Ct. 611-12, 24 L.Ed.2d 530 (1970), on remand, 5 Cir. 1970, 425 F.2d 1211; Kemp v. Beasley, 8 Cir. 1968, 389 F.2d 178, 191
 
 
 [75]
 Reply Brief for Appellants Harris, et al., at 21 (emphasis in original)
 
 
 [76]
 Ten attorneys from the EEOC and the Departments of Justice and Labor are assigned to monitor the decrees' implementation and to report to the government member of the Audit and Review Committee. Brief for Appellee United States, at 43 n. 35
 
 
 [77]
 Citing a policy of the Department of Justice under which proposed antitrust consent decrees are made public for "comment or criticism" thirty days prior to entry, appellants ask us to order the EEOC and Department of Labor to adopt a similar policy for Title VII Executive Order 11246 consent decrees. Appellants assert that we have the necessary authority by virtue of our general supervisory appellate jurisdiction. Perhaps appellants are correct, but we decline at this time to so order the agencies. The issue is not fully briefed, and our reluctance is based on an exercise of discretion. The appellants' idea, however, may deserve serious consideration by the appropriate departments of government
 
 
 [78]
 At least one court has rejected the contention that the amendments narrowed the permissible scope of private Title VII actions instituted subsequent thereto. See Dickerson v. United States Steel Corp., supra, 64 F.R.D. at 359-60 (by vesting EEOC with power to sue, Congress intended to supplement, rather than supplant, existing remedies)
 
 
 [79]
 F.R.Civ.P. 19:
 Rule 19.
 Joinder of Persons Needed for Just Adjudication
 (a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action.
 (b) Determination by Court Whenever Joinder not Feasible. If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.
 (c) Pleading Reasons for Nonjoinder. A pleading asserting a claim for relief shall state the names, if known to the pleader, of any persons as described in subdivision (a)(1)-(2) hereof who are not joined, and the reasons why they are not joined.
 (d) Exception of Class Actions. This rule is subject to the provisions of Rule 23.
 
 
 [80]
 This follows from the rule that the judgment in a government "pattern or practice" action simply does not bind private individuals, unless they voluntarily choose to become parties to it. See note 38, supra. Hence, we also fail to see how the consent decrees "raise difficult questions under . . . the Due Process Clause." Brief for Appellants Harris, et al., at 87. Specifically, we cannot conceive of how the decrees operate as an "adjudication" of appellants' rights, or how their terms may deprive the appellants of life, liberty, or property particularly when, as we have determined, no private person has a "right" to advancement of his or her specific claim in litigation brought by the government, or to representation by the government in court in a capacity comparable to attorney and client. See Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 656-57, 94 L.Ed. 865, 872 (1950). See also our discussion of paragraphs C and 19, supra
 
 
 [81]
 Brief for Appellants Harris, et al., at 87
 
 
 [82]
 Reply Brief for Appellants Harris, et al., at 23. See also footnote 10, supra. The Harris intervenors' complaint in intervention before the district court was to the same effect. Specific reliance was placed on Rule 23. Appendix at 130a
 
 
 [83]
 Certificate Required by Fifth Circuit Local Rule 13(a), Brief for Appellants NOW, et al. Because these 13(a) certificates are sometimes worded broadly in the interest of caution for which the court is appreciative we add the following extract from NOW's amended complaint in intervention, filed in behalf of the three female appellants, which leaves no room for doubt:
 
 
 [3]
 Plaintiffs Beasley, Fix and Halascsak bring this action pursuant to Rule 23(b)(2) and (3), F.R.C.P., on behalf of all former, present and future female employees of Defendant Companies. * * * The class is also composed of female persons who were, or might become members of the Defendant United Steelworkers of America, AFL-CIO, and who have been and continue to be or might be adversely affected by the practices complained of herein
 Appendix at 168a.
 
 
 [84]
 As did Judge Pointer. See 63 F.R.D. at 7
 
 
 [85]
 See, e. g., Franks, supra, 495 F.2d at 421-22; Pettway, supra, 494 F.2d at 256-57; Johnson v. Goodyear Tire & Rubber Co., supra, 491 F.2d at 1375; Bing v. Roadway Express, Inc., supra, 485 F.2d at 447-48; Robinson v. Lorillard Corp., 4 Cir. 1971, 444 F.2d 791, 801-02, cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655; Bowe v. Colgate-Palmolive Co., supra, 416 F.2d 711, 720. The usual arguments for (b)(2) treatment proceed from the theorem that "racial discrimination is by definition class discrimination." E. g., Dickerson v. United States Steel Corp., supra, 64 F.R.D. at 357-59
 
 
 [86]
 The notice contemplated by Rule 23(d)(2), for example, is not mandatory, but rather discretionary with the trial court. Bing, supra, 485 F.2d at 448. "The rule . . . does not command the giving of any notice to members of (b) (1) and (b)(2) types of class actions, and 'in the degree that there is cohesiveness or unity in the class and the representation is effective, the need for notice to the class, will tend toward a minimum.' " 3B. J. Moore's Federal Practice P 23.72, at 23-1421 (1974), quoting Advisory Committee Note, 1966 Amendments to F.R.Civ.P. 23
 
 
 [87]
 We note that NOW apparently has also overlooked the fifty percent minority-female trade and craft ratio set forth in paragraph 10(d) of Consent Decree I, as well as the twenty-five percent minority-female supervisory goal and affirmative action duties undertaken by the companies in subparagraphs 2(a) (3) and (c), respectively, of Decree II's Agreement